*Decision will be entered for the respondent.*

RICE'S TOYOTA WORLD, INC. (FORMERLY RICE AUTO SALES, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16079–80.     Filed August 29, 1983.

*William L. Tankersley III*, and *Kenneth R. Keller*, for the petitioner.

*Gary F. Walker*, for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax as follows:

| TYE June 30— | | Deficiency |
|---|---|---|
| 1976 | ........................ | $104,776.32 |
| 1977 | ........................ | 225,531.31 |
| 1978 | ........................ | 205,347.71 |

Pursuant to Rule 141(b) of the Tax Court Rules of Practice and Procedure,[1] the Court ordered a separate trial for the sole purpose of deciding one issue. That issue is whether petitioner's purchase and leaseback of used computer equipment was a tax-avoidance scheme lacking in economic substance which should be disregarded for tax purposes.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts and the attached exhibits are incorporated herein by reference.

Petitioner Rice's Toyota World, Inc. (Rice Toyota), was a North Carolina corporation with its principal place of business in Greensboro, N.C., when it filed its petition in this case. Federal income tax returns for the taxable years in issue were timely filed with the Internal Revenue Service Center in Memphis, Tenn. Rice Toyota uses the accrual method of accounting with a fiscal year ending June 30.

Petitioner is primarily engaged in the sale of new and used cars. Rice Toyota was the first Toyota dealer in the southeastern United States. Petitioner's founder, president, and sole stockholder, Garson L. Rice (Mr. Rice), began his career as a used car salesman. In the late 1950's, Mr. Rice did a study of Toyota. Believing Toyota would prove to be a big winner, he contacted the Japanese manufacturers and ultimately signed a contract to represent them in the South. Today Rice Toyota is a highly successful business with annual gross sales in excess of $14 million.

### Entry Into Transaction

Although Mr. Rice did not meet with Finalco, Inc. (Finalco), representatives until June 1976, petitioner, Rice Toyota, entered into an agreement dated February 27, 1976, with Finalco, a computer leasing corporation, to purchase a 6-year-

---

[1] References to Rules are to the Tax Court Rules of Practice and Procedure.

old IBM computer. The purchase price was $1,455,227, payable in 96 monthly installments. Finalco leased back the computer equipment for the same 8 years paying rent to petitioner monthly. The net difference between the monthly rentals and the monthly installment payments generated a $10,000 yearly cash flow to petitioner. Simultaneously, Finalco subleased the computer equipment to a third party for a term of 5 years.

During the 8-year leaseback to Finalco, petitioner was not entitled to share in any revenues generated by the equipment. But, upon expiration of Finalco's lease, petitioner would be entitled to a 70-percent interest in any revenues. Finalco retained the other 30 percent and the right to remarket or sell the equipment.

Mr. Rice learned about computer purchase-and-leaseback transactions through a friend who had already entered into a similar transaction. This friend was a client of Finalco.

Finalco is one subsidiary of a group of companies. Its primary business is the leasing of capital equipment. It began as a lessor of computer equipment and expanded its operations to include all types of equipment. At the time of the trial, Finalco was generating leases valued in excess of $100 million a year.

Mr. Rice asked petitioner's accountant, Neill M. Clegg, to telephone Finalco and request information about the types of equipment leasing transactions that were available. Clegg spoke to Stephen Eastman, then assistant general counsel at Finalco. The two men talked two or three times on the phone until Mr. Eastman had a general idea about the type of transaction that would appeal to Rice Toyota.

In late May or early June 1976, Finalco mailed petitioner a letter describing three representative transactions, which varied according to the size of the initial investment. Finalco later sent petitioner a placement memorandum for the transaction that petitioner had selected. This placement memorandum also contained a projected profit-and-loss statement for the entire 8-year transaction. For the taxable years in issue, this statement contained the following relevant information:

|  | TYE<br>June 30, 1976 | TYE<br>June 30, 1977 | TYE<br>June 30, 1978 |
|---|---|---|---|
| Rental income | 0 | $213,101 | $213,101 |
| Nonrecourse note amortization | 0 | 203,101 | 203,101 |
| Cash flow to petitioner | 0 | 10,000 | 10,000 |

Total projected losses generated from accelerated depreciation and interest expense were $782,063 during the first 5 years of the transaction. After this time, the transaction was expected to produce income.

For the taxable years in issue, the projected profit-and-loss sheet provided as follows:

|  | TYE<br>June 30, 1976 | TYE<br>June 30, 1977 | TYE<br>June 30, 1978 |
|---|---|---|---|
| Rental income | 0 | $213,101 | $213,101 |
| Interest expense, nonrecourse | 0 | (83,774) | (82,514) |
| Depreciation expense | ($218,284) | (371,083) | (259,758) |
| Net | (218,284) | (241,756) | (129,171) |
| Tax savings | 109,142 | 120,878 | 64,586 |

Petitioner would owe no cash for the transaction in the taxable year ended June 30, 1976, because the promissory note was dated July 1, 1976. For the taxable year ended June 30, 1976, petitioner claimed a depreciation deduction of $218,284 with no cash outlay.

During the second two taxable years, petitioner could anticipate deductions for interest and depreciation expenses exceeding rental income by a total of $370,927. In taxable years ended June 30, 1977 and 1978, petitioner made out-of-pocket payments of $62,500 and $77,500, respectively.

Petitioner's accountant, Neill Clegg, examined the proposed transaction from an economic viewpoint as well as from a tax viewpoint. He determined that the $10,000 yearly cash flow made good economic sense. In his analysis, he assumed some residual value, and he also considered the possibility of re-leasing the property at the end of the lease.

Mr. Rice was informed by Mr. Clegg that this transaction was not a "tax shelter" but rather a "tax deferral" whereby accelerated depreciation on the equipment in the first 4 years would reduce Rice Toyota's taxes during that period. He

warned Mr. Rice that the decision to enter into the transaction should be based upon a belief of substantial residual value.

Mr. Eastman presented and promoted the purchase and leaseback of the equipment to Mr. Rice. On June 17, 1976, he met with Mr. Rice and petitioner's C.P.A. and tax counsel to discuss the proposed transaction. Mr. Rice and Mr. Eastman reviewed the "upside" of the transaction or its potential for profit and its "downside" or risk of loss. Mr. Eastman represented to Mr. Rice that the net economic effect of the transaction was a $10,000 per year cash flow on a $250,000 investment, equivalent to an after-tax yield of 4 percent. In the worst case, Mr. Eastman said petitioner would net $80,000 of its $250,000 investment. Mr. Eastman advised Mr. Rice that the current list price for new identical IBM equipment was approximately $2,500,000. Mr. Eastman claimed that his projected residual value of 10 to 20 percent, based on that price, would return to petitioner its investment plus profit.

Mr. Eastman delivered to Mr. Rice a document entitled "Rules of Thumb for Pricing Used Computers"[2] with an attached Stanford Research Institute (SRI) report. He pointed out that this study indicated a projected residual value at the end of the 8 years of only 6 percent or about $150,000. Mr. Eastman said that Finalco was comfortable with its higher predicted residual value of 10 to 20 percent, but could not guarantee it. Mr. Eastman also mentioned the profit that might be generated through subsequent dealings and told Mr. Rice that he must consider the residual value of the equipment in determining the investment's worthiness.

Finalco prepared an equipment leasing memorandum that described the proposed transaction. It also prepared a set of purchase and lease documents, including purchase agreements, installment notes, security agreements, leases, and some collateral documents.

The leasing memorandum stated that the transaction was "suitable only for persons anticipating substantial taxable income from other sources." The memorandum assumed no residual value in the equipment at expiration of the lease term, and projected depreciation and interest deductions of

---

[2]"Rules of Thumb for Pricing Used Computers," Stanford Research Institute, February 1975.

$782,063 for an investment of $250,000 or a ratio of 3.128 to 1. The equipment leasing memorandum contained the following:

Since the sale and leaseback with the Owner is for a period of eight years or longer, at the end of the initial term of User Lease, including any extensions required pursuant to the provisions of any guaranteed residual value sections of the User Lease, but prior to the expiration of the initial term of the Finalco Lease with the Owner, Finalco will be entitled to receive all revenues, if any, generated by the Equipment. As noted above, at the end of the initial term of the Finalco Lease, the Equipment will be re-leased or sold and Finalco will be entitled to a participation in all revenue from such re-leasing or sale of the Equipment in the percentage set forth in the "Summary of the Offering" section and as such participation is more fully described in the Purchase Agreement between Finalco and the Owner.

\* \* \* \* \* \* \*

The Finalco Lease on the Equipment is sufficient to amortize the Owner's Non-Recourse Loan and the User Lease is sufficient to amortize the Lending Institution Loan. These leases, however, will not be for periods of time sufficient to recover the total Equity portion of the Sale Price of the Equipment. In order to yield a net income equal to the total unreturned Equity Portion of the Sale Price, the Equipment must be leased for approximately an additional ten (10) months at the original lease rate. While Finalco believes that the average revenue-producing life of the Equipment being acquired pursuant hereto will be in excess of such term from the date of the Owner's purchase, there can be no assurance that the anticipated net income will, in fact be realized for such period.

It also warned that residual value could not be predicted:

There is no assurance whatsoever that any sale or re-lease of the Equipment can be arranged upon expiration of the Finalco Lease \* \* \* . \* \* \* *deterioration, obsolescence and other loss in value of the Equipment over the term of the Finalco lease will certainly occur; the possibility of residual values sufficient to repay the balance of the Equity is speculative, and the amount of any such distributions which may arise is conjectural.* [Emphasis by Finalco.]

The memorandum also provided that, upon expiration of the 8-year lease, Rice Toyota would be entitled to only 70 percent of any net proceeds. Finalco retained a 30-percent interest in any such proceeds.

Despite conflicting information regarding residual value and the warnings in the placement memorandum (which he looked at only briefly), Mr. Rice did not obtain an independent appraisal of the equipment's residual value. In deciding to enter into the transaction, Mr. Rice relied primarily on his own intuition, his credence in people, their "track record," background, and reputation.

## History of the IBM 370/155

The IBM System 370/155 was announced by IBM in June 1970, and first available for delivery in February 1971. Based upon past experience, IBM customers expected the 370/155 to be the current technology machine from IBM for 5 to 6 years. Barely 2 years after the 370/155 appeared, however, IBM announced the System 370/158. The major differences between the 370/155 and the 370/158 were speed (the 158 was about 40 percent faster), integrated virtual memory (a capacity allowing for more efficient memory), and an integrated circuit memory which was considerably less expensive than the 155's magnetic core memory. In an attempt to protect its 155 market, IBM introduced a "dynamic address translation unit" (DAT box) that could be added to the 155 to provide the virtual memory function to 155 users and also introduced the 155-II with integrated dynamic address translation. Petitioner purchased a 370/155-II.

If brand new, petitioner's IBM computer would have cost approximately $2,500,000. By 1974, however, the IBM 370/155 was regarded as a "half generation" or "older" machine, and its price dropped to 50 to 60 percent of its original cost. In 1975, the 370/158's performance was enhanced by 10 percent. So by 1975, it was apparent that the 370/155 was trailing behind new technology.

## Projection of Residual Value

The residual value of a computer is a function of supply and demand, competitive technology, and vendor price. A direct purchaser of a computer would be entitled to a manufacturer's warranty and an investment tax credit (ITC). When a computer is purchased other than directly from the manufacturer, however, the vendor price is often discounted to reflect the absence of these two items. Competitive technology is primarily the rate of decrease in the cost of performance and storage capacity modified by competing maintenance, power, and space costs among equivalent machines. Supply is determined by vendor shipments and turnover of equipment while demand is a function of such factors as growth in the marketplace and the extant level of technology. The residual price for non-obsolete equipment is located between two points, the highest price (vendor price less ITC and warranty) and the lowest price

(the rate of advancing technology). Since the advent of the 1960's space age, technology has been advancing at a rate of about 25 percent per year (measured in dollars per unit of function). The market below the 10-percent residual level is highly distorted because the equipment is sold primarily for parts.

Although there is currently a formula based upon a complex analysis of the used computer market for determining residual values with some degree of accuracy, no such formula existed in 1976 when petitioner entered into this transaction. Participants in the used computer market often made their own forecasts.

The SRI report given to petitioner by Finalco prior to consummation of the deal predicted a residual value for the equipment of 5 or 6 percent by year 14. For petitioner this would be 1984, the year the purchase-leaseback transaction terminated. This predicted residual value, if true, would have been insufficient to cause petitioner to break even, that is, recover its initial capital outlay in the transaction.

The SRI report is actually based upon a composite of computer transactions, surveys of brokers and dealers, and other industry publications. Additional information accompanying the SRI report described market trends for used computer equipment. In describing the trend, among other points, the SRI report contains the following:

> Four years after market introduction, however, the value of computer systems begins to drop precipitously. This drop is due to the decision of many potential buyers to postpone purchases until a new family is available, so the demand for computer systems declines during this period. Historically, IBM has followed the marketing practice of introducing a new, more technologically advanced, line of [Central Processing Units] every five or six years.
>
> Once the new family has been introduced, computer owners begin to trade upward, placing more and more used equipment on the market as it is replaced by the new generation of computer systems. Thus the precipitous drop in used equipment values continues for about three years, finally reaching a new level at about 20% of the purchase price when new.

The report continues:

> In the eleventh year after market introduction, purchasers begin to anticipate the availability of still another new family, causing a further dip in value of the older generation computers.

By year 13, technological innovations in the newer systems have rendered most of the old computers uneconomic to use. Thus their price falls to only slightly more than their scrap value.

The graph on page 193 shows the SRI projected residuals at 5 to 6 percent in 1984. The central processing unit and the peripherals[3] are plotted separately but their curves are similar.

### The Transaction

The essence of the transaction that petitioner selected and which gave rise to the issue before us is as follows: Finalco purchased, with bank loans, a used IBM 370/155–II computer processing system at a total cost of $1,297,643. Petitioner, in effect, purchased a 70-percent interest in the computer equipment from Finalco for $1,455,227, payable in a short-term promissory note issued as a downpayment and two nonrecourse installment notes in the amounts of $1,057,741 and $147,486 relating to the main computer equipment and the peripherals, respectively. The terms of the downpayment promissory note were as follows:

| Date payable | Principal payments | Interest payments | Total payments |
|---|---|---|---|
| June 1976 | $62,500 | 0 | $62,500 |
| June 1977 | 62,500 | $15,000 | 77,500 |
| June 1978 | 62,500 | 10,000 | 72,500 |
| June 1979 | 62,500 | 5,000 | 67,500 |

The monthly payments on the nonrecourse debt to Finalco were $16,925.07. Simultaneously, petitioner leased the equipment back to Finalco for 8 years at a rental of $17,758.40 per month. The difference between these two amounts (rental and nonrecourse debt) netted a monthly cash flow to petitioner of $833.33 or $10,000 a year for 8 years, which petitioner received in $5,000 installments every 6 months. Except for this $833.33 per month, petitioner did not actually receive the monthly cash rental payments of $17,758.40 described in its lease with

---

[3]The central processing system consists of two main components. The central processing unit is the brain function of the computer. The system also includes attachments such as the tape drives and controls that are called peripherals and serve as the workhorse of the system.

USED COMPUTER EQUIPMENT CURVES

Resale value as a percent of
the purchase price when new

CENTRAL PROCESSING UNITS

PERIPHERALS

Years Since Market Introduction

Source: Stanford Research Institute

Finalco. Nor did it actually pay the monthly note installments of $16,925.07.

At the end of the first full year of the transaction,[4] and at the end of the subsequent year, the unpaid balance on petitioner's purchase price was:

|  | TYE<br>June 30, 1977 | TYE<br>June 30, 1978 |
| --- | --- | --- |
| Promissory note | $187,500 | $125,000 |
| First nonrecourse note | 953,016 | 847,186 |
| Second nonrecourse note | 132,884 | 118,127 |
| Total unpaid debt | 1,273,400 | 1,090,313 |

During the same years, the nonrecourse debt exceeded the 100-percent fair market value of the equipment as stated in the generally accepted Computer Price Guide's summer quotes:[5]

|  | 1977 | 1978 |
| --- | --- | --- |
| Fair market value | $930,000 | $750,000 |
| Total nonrecourse debt | 1,085,900 | 965,313 |

But taking into account petitioner's 70-percent interest in the computer, however, total outstanding debt actually exceeded petitioner's share of the quoted fair market value by 51 percent in 1977 and 48 percent in 1978.

Finalco simultaneously subleased the equipment by means of two leases to Owens-Illinois Corp. (Owens-Illinois); the central processing unit was leased for 5 years and the peripheral equipment for 4 years.

### The Terms of the Leases

Finalco subleased the equipment to Owens-Illinois under a 5-year net lease and then "sold" the equipment to Rice Toyota over an 8-year period, subject to its lending institution's first lien. Finalco leased back the equipment from Rice Toyota over the same 8-year period by means of a net lease. The lease gave Finalco the right to subject the equipment to senior liens, sublease the equipment, and assign any revenues generated. Rice Toyota assigned its interest in lease revenues during the primary term to Finalco. Finalco had a right to remarket the

---

[4]The documents were signed in June 1976, around the time of the parties' first meeting. They were, however, backdated to Feb. 27, 1976.

[5]Computer Price Guide, Computer Merchants, Inc., Vol. 7 No. 3, Summer Issue, July 1976.

equipment at expiration of the primary term. At that time it would retain a 30-percent interest in any revenues generated either through re-leasing or resale.

The fine print of the lease stated that Finalco's rental payments to Rice Toyota, which purportedly amortized the 8-year debt, were to be satisfied solely out of the proceeds of its sublease. The sublease with Owens-Illinois was for only 5 years; thus, because petitioner did not secure a full payback during the Owens-Illinois sublease, there was no guarantee that it would receive its projected $10,000 yearly cash flow at the expiration of the 5-year sublease.

Upon default by Finalco, it is likely that Rice Toyota would not be able to foreclose on the property because of Finalco's lending institution's prior liens. Petitioner was not economically at risk in the transaction apart from its cash investment. The tax benefits that petitioner received immediately upon entry into the transaction virtually eliminated any actual risk of loss of investment to petitioner.

On its Federal income tax returns for the years in issue, petitioner reported the gross rentals from Finalco and deducted the following amounts:

|  | TYE June 30, 1976 | TYE June 30, 1977 | TYE June 30, 1978 |
|---|---|---|---|
| Depreciation | $218,284 | $371,082.90 | $259,758.03 |
| Interest |  |  |  |
| Nonrecourse notes | 0 | 83,774.00 | 82,514.00 |
| Downpayment note | 0 | 15,000.00 | 10,000.00 |
|  | 218,284 | 469,856.90 | 352,272.03 |

The Commissioner disallowed all of the above-described deductions.

OPINION

Respondent's primary argument is that petitioner's purchase and leaseback was a tax-avoidance scheme which should be disregarded in its entirety for Federal income tax purposes because it is without economic substance.

It is well established that a transaction entered into solely for the purpose of tax reduction and which has no economic or commercial objective to support it is a sham and without effect for Federal income tax purposes. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Knetsch v. United States*, 364 U.S.

361 (1960); *Milbrew v. Commissioner*, 710 F.2d 1302 (7th Cir. 1983), affg. a Memorandum Opinion of this Court; *Karme v. Commissioner*, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). This "sham transaction theory" is one of a number of theories used by the courts to expose "abusive tax shelters" that masquerade as bona fide business transactions.

Taxpayers are generally free to structure their business transactions as they please, though motivated by tax avoidance, provided a non-tax or business purpose is also present.[6] The point is that the substance of a transaction and not the form will control its tax consequences.

The courts have, in appropriate circumstances, disregarded, for Federal income tax purposes, a variety of transactions entered into without any economic, commercial, or legal purpose other than the hoped for favorable tax consequences.[7] Where a taxpayer, cognizant of potential tax benefits, enters into a transaction of questionable economic worth, the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present.

Many of the questioned transactions center around their use of nonrecourse debt[8] which increases the basis of the acquired asset by the face value of the note. *Crane v. Commissioner*, 331 U.S. 1 (1947).[9] The addition to basis of nonrecourse debt, however, is not unlimited (see text accompanying notes 4 & 5; *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048–1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975)).

Deductions for accelerated depreciation and interest expense are allowable only to the extent of a taxpayer's adjusted

---

[6]*Gregory v. Helvering*, 293 U.S. 465 (1935).

[7]*Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1243 (1981), where we used the sham doctrine to disregard an entire transaction, including a cash investment.

[8]See, e.g., *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975).

[9]Recently, the Supreme Court examined the disposition side of a transaction involving nonrecourse debt. In *Tufts v. Commissioner*, 461 U.S. ___ (1983), the Court held that the amount realized upon the sale of property encumbered by a nonrecourse debt includes the outstanding amount of the obligation, even though that amount exceeds the fair market value of the encumbered property. In so holding, the Court reaffirmed the *Crane* "balancing entry" theory which is that the amount of the nonrecourse liability is to be included in calculating both the basis and the amount realized upon disposition. This theory is based upon the assumption that the mortgage was properly includable in basis from the beginning and that it will be repaid in full.

basis in the asset. The main tax advantage flowing from the use of nonrecourse debt is that payment of taxes can be postponed because deductions for depreciation and interest are used to offset income from other sources. In a transaction that has economic reality, however, the deal will usually reach a "cross-over" point where the depreciation and interest fall to the level of the income generated and begin to turn a profit. At that point, the postponement of taxes on other income ceases because the previous excess of deductions over income ceases and any profits of the venture are added to other income.

The sham transaction theory is broader in scope than an analysis of whether a nonrecourse debt is properly includable in basis.[10] Rather, its focus is on the entire transaction. Is the taxpayer actually acquiring an asset or any non-tax benefit? Is the asset likely to be forfeited after the tax benefits are reaped?

In the sale-leaseback context, for example, if the asset "purchased" is rapidly declining in value and the purchase price is inflated to generate basis through use of nonrecourse debt, the purchase is illusory because the purchaser is building no equity in the asset. Correspondingly, as the value of the asset declines, it is more prudent for the purchaser to abandon the asset to the creditor than continue making payments on the outstanding indebtedness. The indebtedness, therefore, is also illusory. If this situation exists, then the "cash investment" must be viewed as a fee for acquiring the tax benefits and it too should be disregarded.

Drawing a precise line of demarcation between valid and invalid transactions is invariably difficult. Our task is to determine whether petitioner's acquisition of the computer and leaseback transgresses that line, and whether, therefore, it is appropriate to disregard it for tax purposes.

A majority of the cases involving sale-leasebacks have been decided by a strictly factual analysis.[11] Commentators have

---

[10]See, *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981); *Estate of Franklin v. Commissioner, supra.*

[11]*Estate of Franklin v. Commissioner, supra*; *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); *Dunlap v. Commissioner*, 74 T.C. 1377 (1980), revd. and remanded on another issue 670 F.2d 785 (8th Cir. 1982); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982).

expressed concern over the lack of consistency in the judiciary's approach.[12]

The leading case supporting the existence of a sham transaction theory is *Gregory v. Helvering*, 293 U.S. 465 (1935). There, a reorganization complying with all of the formal statutory requirements was disregarded for Federal income tax purposes because no valid economic purpose existed for the creation and immediate liquidation of the transferee corporation. The transaction was simply an attempt to convert ordinary dividend income into capital gains. The Supreme Court's decision was based not on any tax-avoidance motive of the taxpayer, but rather on the lack of a business purpose for the transaction which the statutory scheme contemplated:

> The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. [293 U.S. at 469. Citations omitted.]

As we noted in *Braddock Land Co. v. Commissioner*, 75 T.C. 324, 329 (1980), "The *Gregory* doctrine is not limited to the field of corporate reorganizations, but has a much wider scope."

In the early cases, depreciation deductions inured to the holder of legal title to the property. On occasion, this elevated form over substance. In *Helvering v. Lazarus & Co.*, 308 U.S. 252 (1939), however, the Supreme Court permitted a taxpayer to claim depreciation deductions on a building, title to which was held by a bank but then leased back by the taxpayer. The Court reasoned that the right to depreciation was predicated upon a finding of capital investment, not bare legal title, and held that, notwithstanding the sale-leaseback, the parties intended to create a mortgage loan.

In *Knetsch v. United States*, 364 U.S. 361 (1960), the Supreme Court applied the sham transaction theory to a taxpayer's deduction of interest relating to an indebtedness. The Court directed its attention away from the taxpayer's tax-avoidance motive and focused instead on the taxpayer's failure

---

[12]Wolfman, "The Supreme Court in the *Lyon's* Den: A Failure of Judicial Process," 66 Cornell L. Rev. 1075 (1981).

to establish the presence of business purpose (his subjective state of mind) or a justifying economic substance (an objective test) in the transaction.[13]

The Fourth Circuit, to which an appeal in this case would lie, interpreted *Knetsch* in *Bridges v. Commissioner*, 325 F.2d 180 (4th Cir. 1963), affg. 39 T.C. 1064 (1963), as follows:

> The Court in *Knetsch* held that the tax reduction motive or intent is immaterial in such cases and that the determinative question as to "whether what was done, apart from the tax motive, was the thing which the statute intended" is answered in the negative if it is apparent "that there was nothing of substance to be realized by [the taxpayer] from [the] transaction beyond a tax deduction." There the Court concluded that it was clearly apparent that "Knetsch's transaction * * * did 'not appreciably affect his beneficial interest except to reduce his tax.' " In view of such a finding, the Court held that the transaction was a sham * * * . [325 F.2d at 184. Citations omitted; brackets supplied by the Court.]

In *Bridges v. Commissioner, supra*, the taxpayer borrowed funds to purchase Treasury bonds, pledging the bonds as collateral to secure the loan. Although the taxpayer was technically obligated on the debt, the Tax Court found that there was "no reason to think that [taxpayer] could or would have been called upon to pay the note out of his own funds." 39 T.C. at 1077.

In *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), cert. denied 385 U.S. 1005 (1967), the Court of Appeals interpreted *Knetsch*, with the following result. In a transaction similar to the one in *Bridges*, it rejected the Tax Court's finding that a debt was a sham and held that a valid indebtedness had been created. Despite the fact that the debt involved was recourse and the taxpayer might well have sustained an economic loss, the court, nonetheless, denied the taxpayer's interest deductions on the ground that the taxpayer was solely engaged in a tax saving maneuver and not a "purposive activity."

The theory of the Second Circuit appears to create two distinct categories, the sham transaction theory and an economic motivation requirement, with the result that interest expense arising from a bona fide indebtedness must, to be

---

[13]See also *Gregory v. Helvering, supra.*

deductible, meet an additional requirement of economic motivation. *Goldstein v. Commissioner, supra* at 741.

Other courts have denied interest deductions arising out of transactions analogous to those in *Bridges* without first calling the transaction a sham. These courts reserve the term "sham" for a more narrow situation in which the transaction used by the taxpayer is, for example, merely a paper transaction or a "fake" transmission of money.

The Court of Claims has developed the "purposive activity" standard established in *Goldstein*. In *Rothschild v. United States*, 186 Ct. Cl. 709, 407 F.2d 404 (1969), the court stated, "interest is not allowed to be deducted if no economic gain could be realized beyond a tax deduction." 407 F.2d at 406.[14]

This approach, however, is not one taken by this Court in cases decided subsequent to the Supreme Court's decision in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978).[15]

In *Frank Lyon*, a sale-leaseback case, the Supreme Court dealt with the problem of allocating depreciation deductions. The facts of that case are as follows: Worthen Bank (seller-lessee), which was prohibited by State and Federal regulations from financing the construction of a new bank building through conventional methods, entered into a sale-leaseback arrangement. It leased the underlying land to an independent third party, Frank Lyon (buyer-lessor), sold the building to that third party in stages during construction, and then leased it back. The buyer-lessor (Lyon) purchased the building for a total of $7,600,000. Lyon put $500,000 down and financed the remaining sum from a third-party lender. The loan was secured by a 25-year mortgage, an assignment of the ground and building lease, the buyer's promise to assume personal responsibility for the loan's repayment, plus a promise that

---

[14]We note that neither the legislative history nor the language of sec. 163(a), I.R.C. 1954, amended, reveals a congressional intent to so restrict the interest deduction. See *Wachovia Bank & Trust Co. v. United States*, 499 F. Supp. 615 (M.D. N.C. 1980), for a discussion of these divergent theories.

[15]In *Braddock Land Co. v. Commissioner*, 75 T.C. 324 (1980), applying the sham transaction theory, we found a purported cancellation of indebtedness lacking in both business purpose and economic substance and on that basis disregarded it for Federal tax purposes. See also *Grodt & McKay Realty, Inc. v. Commissioner, supra; Hager v. Commissioner*, 76 T.C. 759 (1981); *Narver v. Commissioner, supra; Estate of Franklin v. Commissioner, supra* at 1048 n. 4.

the building lease would extend through the duration of the 25-year mortgage at a rental at least equal to the monthly mortgage payments.

The building lease ran for a primary term of 25 years. During this time, Worthen Bank retained options to repurchase the building at the end of the 11th, 15th, 20th, and 25th years for amounts equal to the then-outstanding mortgage plus the initial $500,000 downpayment with 6-percent compounded interest. Alternatively, the bank could opt to renew the lease for eight additional 5-year terms. Rental payments during the first 25 years were exactly equal to the mortgage payments but were reduced for each elected renewal. This was a net lease, the bank remaining obligated at all times to maintain the building, to pay all taxes and utility charges, and to buy insurance.

The underlying land was leased to Lyon for 76 years, 10 years beyond the primary term plus all renewal options. This enabled Lyon to renegotiate a further extension or find another suitable tenant. If this was not accomplished, the land and the building would revert back to Worthen Bank.

The Commissioner disallowed Lyon's claimed depreciation and interest deductions asserting that Lyon was not really the owner of the building for tax purposes and the deal was merely a two-party financing arrangement whereby Lyon lent Worthen Bank $500,000 and acted as a conduit between the mortgage payment from Worthen to Lyon (as mortgagee).

The Supreme Court approved the transaction and found that Lyon was indeed the owner of the property for tax purposes. It enunciated the following broad principles:

> where * * * there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. [435 U.S. at 583–584.]

The Supreme Court relied upon approximately 26 factors that were peculiar to the transaction at issue in *Frank Lyon*. *Frank Lyon* stands for the principle that, in a sale-leaseback context, a nonuser-owner recipient of tax benefits must prove that his entry into the transaction was motivated by a business purpose sufficient to justify the form of the transaction. And

further, he must show that the underlying transaction was supported by economic substance, i.e., the possibility of profit.[16] The precise degree of business motive or economic substance that must be present in a transaction recognized for tax purposes is not clearly defined. The presence of a genuine indebtedness supported by an actual investment, however, is strong evidence of economic substance.

In *Frank Lyon*, the taxpayer was successful in convincing the Court of its "business purpose" (notwithstanding any tax-avoidance motivation) *and* showing a likelihood of real economic benefit inuring to the taxpayer. The taxpayer was also able to show a beneficial ownership in the property sufficient to support the concomitant depreciation deductions and a valid indebtedness to support the associated interest deductions. Apart from the tax considerations, the buyer also had the downside risk of loss in his investment and the upside potential of at least a return of capital plus the real possibility of more than an inconsequential return on his investment.

Throughout its brief, Rice Toyota attempts to validate its arrangement by its repeated claim that it entered into the transaction with a business purpose—to make a profit. We disagree. The record shows that there is little, apart from tax considerations, to justify petitioner's entry into this purchase-leaseback. Petitioner's president testified at trial that when he entered into any transaction for profit, he looked at the economic benefits foreseeable from rent, equity buildup, and potential residual value upon termination of the lease. The record clearly shows, however, that Mr. Rice did not evaluate this transaction on that basis. He knew nothing about computers, yet he relied upon the representations of the deal's promoter, of a friend, and the "gut" feeling that it was a good deal. Petitioner's tax lawyer and accountant barely touched on the economics with Mr. Rice except to warn him that residual value was critical to an economic profit. Yet he made no effort to determine whether Rice Toyota was purchasing an obsolete computer or one that would have a high residual value. Mr. Rice remembered discussing only the tax benefits.

---

[16]*Hilton v. Commissioner, supra* at 349–350.

Our analysis does not end here. Mr. Rice's failure to focus on the business or non-tax aspects of the transaction is not necessarily fatal to petitioner's claim. If an objective analysis of the investment indicates a realistic opportunity for economic profit which would justify the form of the transaction, it will not be classified as a sham.[17] In order to make this determination, we must probe beneath the labels given by the parties and view the transaction in the context of its surrounding facts and circumstances.

We analyzed a similar transaction on this basis in *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). In that case, we were faced with a sale-leaseback arrangement involving a department store chain. The department store chain (seller-lessee), assisted by a New York investment firm, entered into a sale-and-leaseback arrangement for the financing corporation (buyer-lessor) to finance the costs of a newly constructed retail outlet.

The department store built the property with its own funds but then sold it to the investment firm, who funded the purchase by selling its own corporate notes to five insurance company lenders. As security for the notes, the investment firm gave the insurance companies a mortgage on the property and assigned to them the leases and rentals.

Simultaneously, the department store leased back the property for an initial term of 30 years with options to renew. Rent was set at 6.33 percent of the purchase price and calculated to meet mortgage payments and incidental expenses. Rent was reduced for each of the renewal terms. The lease was a net lease and all rentals went directly to the insurance companies. There was a 10-percent balloon payment at expiration of the initial lease term, and the department

---

[17]In *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the Government argued sham, but the Supreme Court rejected that argument because it found sufficient business purpose for the transaction. Once business purpose is established, the transaction should not be classified a "sham." A finding of no business purpose, however, is not conclusive evidence of a sham transaction. The transaction will still be valid if it possesses some modicum of economic substance. See also *Grodt & McKay Realty, Inc. v Commissioner, supra* at 1243.

Conversely, transactions devoid of economic substance are not always shams such as where a taxpayer mistakenly believes there existed a potential for profit. But, when there is a finding that the taxpayer entered into the transaction for tax reasons only, then it is proper to subject the transaction to an objective economic analysis to determine whether there could have been an opportunity for profit.

store had a right of first refusal to purchase the property if the investment firm received a bona fide offer to purchase. The investment firm transferred the property to a general partnership, which was promoted to investors on the basis of its tax benefits.

The issue in *Hilton* was the deductibility of losses attributable to interest expense and depreciation allowances which flowed through to the partners. The Commissioner disallowed the claimed deductions on the ground that the sale-leaseback was a two-party financing arrangement, and that the parties therefore did not acquire enough indicia of ownership to make them owners of the property for income tax purposes. In *Hilton*, we said:

> Under * * * *Frank Lyon* * * * , petitioners must show not only that their participation in the sale-leaseback was not motivated or shaped solely by tax avoidance features that have meaningless labels attached, but also that there is economic substance to the transaction independent of the apparent tax shelter potential. [74 T.C. at 349–350.]

Applying *Frank Lyon*, then, we concluded that the taxpayers could not show the existence of (1) a genuine multiple-party transaction with (2) economic substance, (3) compelled or encouraged by business realities, and (4) imbued with tax independent considerations that were not shaped solely by tax-avoidance features. In short, the partnership was merely a conduit through which the seller-lessee's debt payments passed on their way to the insurance companies. The partners had no "investment" in the property upon which depreciation could be predicated. We also concluded that the nonrecourse debt had no economic significance to the partners; and, therefore, they could not deduct shares of the loss generated by the interest expense. 74 T.C. at 364.

In determining whether the taxpayer had made an actual investment in the property, the critical factual consideration was whether the foreseeable value of the property would ever make abandonment by the buyer-lessor imprudent. *Hilton v. Commissioner, supra* at 350. We analyzed the taxpayer's evidence of residual value and concluded that the taxpayer had not established the necessary factual link between the property in issue and its factual assumptions:

> It might have been gratifying for petitioners to know that they could expect to realize a certain return on their investment if the property will be worth a

certain amount when the lease expires, but that knowledge has little utility if it cannot reasonably be demonstrated that the property will actually have that value. [74 T.C. at 353.]

We further noted that the seller-lessee had "carte blanche" to sublet the property or assign its leasehold interest after the original term of the lease. The buyer-lessor's interest was strictly limited at the expiration of the primary lease, and the taxpayer would not be in a position to realize any economic value remaining in the property. *Hilton v. Commissioner*, *supra* at 358.

In the instant case, petitioner and respondent rely heavily upon expert testimony to show the presence or absence of economic substance in the transaction. Most of the testimony went to the projected residual value of the computer equipment. Based upon an original cost of $2,500,000, expert witnesses estimated the following residual values:

| Source[18] | Residual value | Dollar appraisal | Petitioner's 70% interest |
|---|---|---|---|
| SRI Report | 6% | $150,000 | $105,000 |
| Baker | 10% - 15% | 250,000 - 375,000 | 175,000 - 262,500 |
| Eatman | | 200,000 - 220,000 | 140,000 - 154,000 |
| Morgan | | 62,000 | 43,400 |
| Withington | | 18,000 | 13,000 |
| McFarland | | 112,000 | 78,000 |

We found respondent's witnesses more credible, both in terms of their forecasting techniques and in their results, which were closer to the SRI report predictions as well as Finalco's own representations. After considering all the evidence carefully, we conclude that the residual value of the petitioner's computer would not exceed the projection of the SRI report of $150,000. Taking into account petitioner's 70-percent interest, its share of the residual value would be $105,000 in 1984.

The price of the computer system purchased from Finalco was $1,455,277, with a downpayment of $250,000 plus 8-percent interest (paid in 4 yearly installments of $62,500). The balance was paid in 96 equal monthly installments of $16,925.07, also at 8-percent interest. Finalco promised an annual cash flow to petitioner of $10,000. Since petitioner

---

[18]Baker and Eastman testified for petitioner, Morgan, Withington and McFarland for respondent.

retained only a 70-percent interest in any net revenues generated at the end of the 8-year lease, it would be entitled to only 70 percent of any residual value. Based upon our conclusion as to residual value and assuming a discount rate of zero, petitioner would not even recover his initial investment of $250,000, plus $30,000 interest, less the promised $10,000 yearly cash flow ($80,000), upon expiration of the 8-year lease.

Our analysis of the facts in the instant case leads us to conclude that petitioner here, as in *Hilton*, would not be in a position to realize economic value remaining in the property. The risk involved in betting against IBM technology in favor of a high residual value on a 14-year-old computer was enormous. Moreover, petitioner retained only a 70-percent interest in any reversionary proceeds and Finalco had exclusive remarketing rights. We conclude that no economic value could be realized. Inasmuch as petitioner was not acquiring an asset of any foreseeable value and would be likely to walk away from the transaction, we conclude, as we did in *Hilton*, that there is no actual investment upon which the depreciation can be predicated.

Further support for this conclusion is found in the fact that the promised $80,000 cash flow ($10,000 per year for 8 years) to be paid to petitioner over the 8 years of the primary lease was also highly contingent. The fine print of the lease between Finalco and petitioner provided that the rental payments generating the cash flow would be satisfied solely from its sublease with Owens-Illinois which ran only 5 years.

In *Dunlap v. Commissioner*, 74 T.C. 1377 (1980), revd. and remanded on another issue 670 F.2d 785 (8th Cir. 1982), involving a sale-leaseback transaction, Safeway Stores constructed an office building and distribution center and then sold it to a single-purpose finance corporation subject to a leaseback. The purchase price was $8,800,000, and of that amount, all but about $400,000 was financed by placing secured notes of the finance corporation with institutional investors. The notes were secured by the property and an assignment of rents. The balance of the purchase price was financed by individual investors, one of whom was the taxpayer. The taxpayer made a cash payment of slightly more than $100,000. There was insignificant cash flow during the

lease term. The lease was triple net and ran for 25 years with six renewal terms of 5 years each.

The Commissioner in that case argued that the sale-leaseback was a sham entered into for the sole purpose of creating artificial tax losses and that the sale-leaseback was nothing more than a two-party financing arrangement.[19] We rejected these arguments, holding that the transaction was a valid sale-leaseback. In so doing, we relied mainly upon two factors. First, we found that the taxpayer had made an actual investment in the property. If the lease were renewed, we reasoned, the co-owner's yield after payoff of the mortgage would be a high percentage of his original investment. Second, we found that the building had a useful life of 35 years. Thus, despite the likelihood of only two 5-year renewal periods, we upheld the transaction. It is important to note that we made no finding as to residual value, because the only evidence regarding the residual value of the land was taxpayer's testimony that he believed the land would appreciate in value because the land was expected to be densely populated by that point and the land could be put to better use. We accepted taxpayer's testimony that he expected substantial appreciation in the property. The Commissioner, who had the burden of proof on this issue, failed to controvert this testimony. We distinguish *Dunlap* from the instant case on this point. Here, the residual value is crucial to petitioner's assertion that the transaction possessed economic substance. As shown by the financial calculations and using even the most optimistic forecasts, the transaction in the case before us could not prove profitable.

Under the sham transaction theory by which we disregard the transaction in its entirety, it follows that the "cash investment" is also not properly includable in taxpayer's basis. Since petitioner was not making an actual investment in an asset, the transaction presents no opportunity other than for tax reduction. The cash downpayment, therefore, must be viewed as a fee for purchasing tax benefits.

---

[19] We do not necessarily accord much significance to whether there were two or three parties involved in a transaction. "The use of a third party in a given transaction may be made in such a way as to give the appearance of importing substance to the transaction but, in reality, the interjection of the third party may be no more than 'window dressing.'" *Burns v. Commissioner*, 78 T.C. 185, 212.(1982).

Nor has petitioner satisfied the "prudent abandonment" test as set forth in *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), and *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982), as to the propriety of including the nonrecourse debt in basis. *Estate of Franklin* involved the deductibility of interest and depreciation payments claimed on a motel purchased by a limited partnership. The seller sold the property to the partnership for $1,224,000. This nonrecourse obligation was financed over a 10-year period by an immediate payment of $75,000 prepaid interest, by principal and interest payments of about $9,000 per month, and a balloon payment of the remaining purchase price ($975,000) at the end of 10 years. Apart from the $75,000, no cash crossed between the partnership and seller until the balloon payment. The seller was responsible for all typical expenses of hotel ownership. The taxpayer in *Estate of Franklin* failed to prove that the purchase price was at least approximately equivalent to the fair market value of the property:

An acquisition such as that of [taxpayer] if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale.

No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. *Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value.* Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. [544 F.2d at 1048. Fn. refs. omitted; emphasis added.]

In *Narver v. Commissioner, supra,* we invalidated another sale-leaseback transaction. There, a corporation purchased an office building and sold it to two limited partnerships in each of which the corporation was a general partner. The purchase price was secured by a 20-year mortgage. Though the limited partnerships paid taxes and kept insurance, the corporation remained liable on the underlying mortgage.

Simultaneously, the limited partnerships leased the building and underlying land to a wholly owned subsidiary of the corporation for rentals which amortized the limited partner-

ships' mortgage obligation to the seller-lessee corporation. The Commissioner disallowed the limited partners' deductions on the basis that they were not owners of the building nor validly indebted to the corporation for its purchase. Agreeing with the Commissioner, we held the transaction was a sham and would not support the claimed interest and depreciation deductions. We based our decision upon a finding of lack of genuine indebtedness, citing *Knetsch*, and a lack of an actual investment. In focusing on these factors we looked at the fair market value of the property and found the purchase price to be far in excess of its fair market value, as in *Estate of Franklin*.

The facts in the instant case show that petitioner paid more than the fair market value of the used computer. In reality, petitioner purchased only a 70-percent interest in the equipment. Thus, the amount of nonrecourse debt outstanding was greater than the value of the equipment right from the start. Petitioner could acquire no equity in the property. The downward curve in the residual value (see chart, *supra* at 193), compared to the high level of nonrecourse financing made it unlikely that the fair market value of the equipment would ever approach, let alone exceed, the unpaid balance on this debt. This leads us to conclude that there would be no likelihood of payment because only an imprudent taxpayer would discharge a nonrecourse debt to retain an asset with a value substantially less than the amount of the debt. Since the note would never be paid, on this theory as well, we hold that no portion of petitioner's nonrecourse debt should be includable in petitioner's basis because it is not a valid indebtedness.

In summary, the sham transaction theory is used to separate those "business transactions" entitled to deference from those which are not. It requires that business transactions meet a minimum threshold of a business purpose or economic objective. In the instant case, we were unconvinced that petitioner had the requisite business purpose upon entering the purchase-leaseback. Our next step was to examine the transaction for economic substance, an objective test. This requires that we first analyze the transaction as a prudent businessman would to ascertain whether it had any economic substance apart from its beneficial tax consequences. In other words, was there a "realistic hope of profit"? *Dunlap v. Commissioner*, 74 T.C. 1377 (1980), revd. and remanded on

another issue 670 F.2d 785 (8th Cir. 1982). We found none. We then probed beyond the labels given by the parties and questioned whether there was an actual investment upon which depreciation could be predicated and which would support a genuine nonrecourse indebtedness. As in *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), we found that from an economic standpoint petitioner would find it prudent to abandon the property. As such was the case, the transaction lacks economic substance and the nonrecourse debt is not properly includable in petitioner's basis. Because the cash downpayment was not used to acquire an asset but was more akin to a fee to purchase tax savings, it too is excluded from basis.[20]

We hold that the transaction was not motivated by a business purpose, was devoid of economic substance, and should be disregarded for Federal income tax purposes.

*Decision will be entered under Rule 155.*

---

[20]*Dresser v. United States*, 74 Ct. Cl. 55, 55 F.2d 499 (1932); *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1243; *May v. Commissioner*, T.C. Memo. 1972–70.

