NIAGARA COUNTY SAVINGS BANK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Niagara County Sav. Bank v. Commissioner
Docket Nos. 23612-81, 26339-82.
United States Tax Court
T.C. Memo 1984-247; 1984 Tax Ct. Memo LEXIS 434; 48 T.C.M. (CCH) 51; T.C.M. (RIA) 84247; May 7, 1984. Jerome D. Adner and Albert R. Mugel, for the petitioners. Louis J. Zeller, Jr., for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Year
Deficiency
1977
$16,897.77
1978
4,219.31
*435 These cases have been consolidated for trial, briefing, and opinion. After concessions, the only issue is whether the amount of investment tax credit allowable for certain property is limited by section 46(e). [1]
FINDINGS OF FACT Some of the facts are stipulated and found accordingly. Petitioner, Niagara County Savings Bank, is a mutual savings bank chartered by the State of New York. Its principal place of business was in Niagara Falls, New York, when the petition was filed herein. At all relevant times, petitioner's chief officers included: John G. Orr, President (Orr); Frank V. Nicolette, Senior Vice-President and Secretary (Nicolette); and George J. Detkos, Senior Vice-President and Treasurer (Detkos). In February 1973 petitioner incorporated Power Canal Properties Corporation (herein PCPC) under the laws of New York for the purpose of acquiring real property which petitioner was not allowed to purchase due to existing state banking regulations. Petitioner initially contributed one parcel of real property to PCPC in exchange for 100 shares *436 of PCPC stock. [2] During all of the relevant years, petitioner continued to be PCPC's sole shareholder. Orr, Nicolette, and Detkos were also PCPC's directors and three of its four officers. In the early part of 1977, petitioner commenced negotiations for the purchase of computer equipment from TRW and for the purchase of telephone equipment from ITT. In July 1977, however, Orr informed petitioner's board of trustees that "tax benefits" could be achieved by leasing the computer and telephone equipment from PCPC.In order to carry out this plan, Orr recommended that petitioner lend PCPC the requisite funds to purchase the equipment and explained that the leasing arrangement could be structured to allow PCPC to repay that loan out of the proceeds it received under the lease. Subsequently, the board of trustees approved Orr's proposal. On July 25, 1977, PCPC's board of directors held a special meeting *437 to decide whether PCPC should enter the business of leasing personal property. After Orr explained what petitioner's board of trustees had agreed to, PCPC's board voted to purchase the computer and telephone equipment and then lease it to petitioner. Although these purchases were not approved by PCPC until July 25, 1977, Nicolette signed a sales agreement to purchase the telephone equipment from ITT on behalf of PCPC on July 15, 1977.
On November 1, 1977, petitioner agreed to lease the computer equipment from PCPC for $435,001.56 payable in 84 monthly installments of $5,178.59 and to lease the telephone equipment from PCPC for $85,162.80 payable in 120 monthly installments of $709.69. [3] On that same day, petitioner lent PCPC $257,000 at 9 percent interest payable in 84 monthly installments of $4,135.13 and an additional $43,000 at 9 percent interest payable in 120 monthly installments of $544.81. The loans were secured only by the computer and telephone equipment. Pursuant to their lease agreement, petitioner was responsible for all repairs and petitioner bore the entire risk of loss and damage to the equipment. There was no provision for allocating any investment tax credit *438 allowable in connection with the equipment. Petitioner also provided PCPC with additional funds for purchasing the equipment by making a capital contribution of $100,000. [4]
During 1977 and 1978 PCPC also purchased several items of personal property which it leased to petitioner. Petitioner did not attempt to lease any of these items from other lessors. Since PCPC did not have any of its own employees, it used petitioner's employees to perform all administrative functions with respect to the equipment and other personal property (herein collectively referred to as the leased property). During the years in issue, PCPC only received rental income from petitioner. Petitioner and PCPC filed consolidated returns for the years in issue. On their 1977 return, petitioner reported taxable income of $778,821.47 and PCPC reported a loss of $2,970.00. On their 1978 return, petitioner reported taxable income of $1,002,405.15 and PCPC reported *439 a loss of $5,411.36. [5] In addition, on their 1977 and 1978 consolidated returns, PCPC claimed a ten percent investment tax credit with respect to the leased property. In his notices of deficiency, respondent determined that petitioner, not PCPC, was the actual owner of the leased property and that, consequently, since petitioner was a section 593 organization [6] the amount of investment tax credit was limited by section 46(e). OPINION The only issue is whether the amount of investment tax credit allowable in connection with the leased property is limited by section 46(e). Sections 38 and 46 generally provide a credit for certain qualified *440 property. With certain exceptions not relevant to this case, see e.g. sec. 48(d), the credit is available only to the owner of the qualified property. Additionally, in the case of an organization to which section 593 applies, the credit is limited to 50 percent of the otherwise allowable amount. Sec. 46(e)(1)(A) and (2)(A). Since petitioner agrees that it is a section 593 organization and would be subject to the section 46(e) limitation if it is deemed to be the owner of the leased property, resolution of the issue herein depends on whether petitioner or PCPC is the actual owner of the leased property. Respondent argues that the leasing arrangement was a sham transaction and that petitioner is therefore the true owner. Petitioner contends, however, that the leasing arrangement was bona fide and therefore PCPC should not be disregarded as the owner of the leased property. For the following reasons, we agree with respondent. It is well established that transactions entered into solely for the purpose of tax avoidance, which lack an economic or business purpose, are shams and will not be *441 given effect for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Knetsch v. United States,364 U.S. 361 (1960). See Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), on appeal (4th Cir., Feb. 27, 1984). The leading case supporting the existence of the "sham transaction" doctrine is Gregory v. Helvering,293 U.S. 465 (1935). Therein a reorganization which otherwise complied with all the formal statutory requirements for tax-free treatment was disregarded for Federal income tax purposes because no valid business purpose existed for the creation and immediate liquidation of the transferee corporation. The Court ruled that the transaction was simply an attempt to convert ordinary income into capital gain. While the taxpayer is generally free to structure business transactions in such a way as to minimize taxes, such transactions will not be respected for Federal income tax purposes when the taxpayer fails to establish the presence of an economic or business purpose for the *442 transaction. Gregory v. Helvering,supra at 469; Rice's Toyota World, Inc. v. Commissioner,supra, and cases cited therein. Moreover, as we noted in Braddock Land Co. v. Commissioner,75 T.C. 324, 329 (1980), the "sham transaction" doctrine is not limited to the field of corporate reorganizations, but rather applies to Federal taxing statutes generally. In the instant case, petitioner argues that it had four business purposes for entering into the leasing arrangement with PCPC. First, petitioner contends that the leasing arrangement allowed it to retain funds for lending purposes because it did not have to purchase "sterile assets," that is, assets which do not directly produce income. We reject this contention, however, because the leasing arrangement did not allow petitioner to retain the funds it would have needed to purchase the leased property since petitioner had to either contribute or lend these same funds to PCPC so that PCPC could purchase the leased property. Although petitioner charged a nine percent interest on any money it loaned PCPC, petitioner would have been in a better economic position if it had *443 purchased the leased property because petitioner's rental payments to PCPC each month exceeded any loan payments PCPC made to petitioner. Thus, since the leasing arrangement did not enable petitioner to retain more funds for lending, we do not find petitioner's first reason for entering into the leasing arrangement a valid business purpose.
Petitioner's next two alleged business reasons for entering into the leasing arrangement center on its desire to have PCPC become a profitable corporation. The reasons it wanted PCPC to become profitable are twofold. First, any losses incurred by PCPC reduced petitioner's net worth and consequently its lending capacity. Second, PCPC's losses were of no benefit to petitioner for state tax purposes because consolidated returns are not allowed under New York franchise tax laws.We are not convinced, however, that these reasons motivated petitioner to enter into the leasing arrangement with PCPC. As reflected in the corporate minutes, it is clear that petitioner's board of trustees was not concerned with whether PCPC would become profitable as a result of the leasing arrangement. Moreover, PCPC's losses actually increased in 1978 and 1979 and *444 petitioner has failed to show whether the leasing arrangement would make PCPC profitable. Thus, we do not find that petitioner's desire to have PCPC become a profitable corporation was a good-faith business reason for entering into the leasing arrangement. Petitioner's final argument is that the leasing arrangement enabled petitioner to pay the state sales tax on the leased property over the period of each lease as opposed to paying the full amount when PCPC purchased the leased property. Petitioner contends that by deferring the payment of sales tax it had more cash available for lending to customers. We, however, reject this contention because the amount of money saved by deferring the payment of sales tax was de minimis in comparison to the amount of money petitioner had available for lending purposes and therefore could not have been a good-faith reason for petitioner entering into the leasing arrangement. See Cirelli v. Commissioner,82 T.C. 335 (1984). Finally, the sham nature of the leasing arrangement is evidenced by several factors. Petitioner, not PCPC, made all decisions with respect to the leased property including which property to purchase and *445 how much to spend, petitioner had to either lend or contribute to PCPC all the money necessary to purchase the leased property, and PCPC used petitioner's employees to perform the requisite administrative functions in connection with the leased property. Also significant is the fact that one of petitioner's officers signed a contract on behalf of PCPC to purchase telephone equipment ten days before PCPC's board of directors approved the purchase. These factors make it clear that petitioner was effectively the owner of the leased property and that PCPC's participation was essentially limited to holding title. Thus, we conclude that the leasing arrangement was nothing but a sham and should be disregarded for Federal income tax purposes. Accordingly, petitioner is deemed the owner of the leased property and, thus, the amount of its allowable investment tax credit is limited by section 46(e). [7]
To reflect concessions and the foregoing, Decisions will *446 be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. From 1973 through 1976 PCPC purchased additional parcels of real property with funds petitioner either contributed to PCPC in exchange for stock or lent to PCPC. Although PCPC rented some of the real property, it nevertheless sustained losses in 1973, 1974, 1975, and 1976.↩
3. Petitioner was also required to pay all of the New York State sales tax on the computer and telephone equipment over the period of the lease. ↩
4. PCPC paid $321,321.85 for the computer equipment and $55,749.05 for the telephone equipment.↩
5. On both consolidated returns petitioner computed its reserves for losses on loans using the percentage of taxable income method pursuant to sec. 593↩. 6. A sec. 593↩ organization is any mutual savings bank, domestic building and loan association, or cooperative bank without capital stock organized and operated for mutual purposes and without profit.
7. Respondent also argued that PCPC's investment tax credits for the leased property should be reallocated to petitioner under sec. 482. Since we found the leasing arrangement was a sham, we need not address this argument.↩