INTERNATIONAL MINERALS AND CHEMICAL CORPORATION AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
International Minerals & Chemical Corp. v. Commissioner
Docket No. 19735-80
United States Tax Court
T.C. Memo 1984-147; 1984 Tax Ct. Memo LEXIS 525; 47 T.C.M. (CCH) 1350; T.C.M. (RIA) 84147; March 26, 1984. Warren C. Seieroe,Charles N. Huber,James L. Malone, III, for the petitioner. Ronald *526 A. Stein,Seymour I. Sherman, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies of $885,646 and $913,294 in the Federal income tax of petitioner International Minerals and Chemical Corporation and subsidiaries for the fiscal years ended June 30, 1973, and June 30, 1974. After concessions, the sole issue remaining for our decision is whether a sale of certain property by Royster Co. to Wayland Corporation and a contemporaneous lease of that property to petitioner was in substance a sale directly to petitioner. FINDINGS OF FACT Some of the facts have been stipulated and those facts are so found. The several stipulations and attached exhibits are incorporated herein by this reference. Petitioner International Minerals & Chemical Corporation (hereinafter IMC) is a corporation whose principal office is located in Mundelein, Illinois. IMC maintains its books of account on an accrual basis and files its Federal income tax returns on a consolidated basis with certain subsidiaries based on a fiscal year ending June 30. One of IMC's principal business activities is the mining, processing, *527 and selling of phosphate rock, an important ingredient in the manufacture of many fertilizer products. Petitioner is, and has been at all pertinent times, the world's leading private producer of fertilizer materials. Phosphate ore deposits are prevalent throughout the Polk County area in central Florida where many producers and processors have their operations and which is the principal phosphate producing area in the United States. The ore body in this area consists of geological strata known as the Bone Valley Formation which occurs in varying thicknesses and which undulates beneath a layer of sand overburden that is usually from 10 to 60 feet thick. The ore-bearing Bone Valley Formation itself typically consists of roughly equal parts of clay, sand, and phosphate but the composition varies from one area to another and the phosphate component thereof varies materially in the degree of purity. Also, the ore-bearing formation contains a variety of undesirable elements such as magnesium, iron, aluminum, arsenic and various insolubles in varying concentrations from one area to another. IMC has operated in the central Florida area for many years and owns extensive mineral interests *528 and mining facilities in Polk County and surrounding areas. As the time of the transactions involved herein IMC had mining facilities located at Kingsford, Noralyn, Phosphoria and Clear Springs, and ownership or mineral rights to some 20,000 acres of surrounding property in central Florida. In addition, IMC held extensive mineral lands but no mining facilities in south Florida. Through operations, acquisitions and dispositions, its land and mineral holdings constantly change [1] but generally IMC has central Florida reserves which are expected to last until about the end of the century. At that time operations are expected to shift to south Florida. Royster Co. (Royster) is a small family controlled company located in Virginia and engaged in the fertilizer business. For many years prior to May 1973, Royster owned approximately 1,927 acres of phosphate-bearing land located in Polk County, Florida. The Royster property contained *529 the last major block of high quality phosphate reserves located in central Florida and not owned by a producing company. The Royster property was adjacent to tracts of land owned by IMC in 1973, and was in the vicinity of IMC's Clear Springs, Noralyn, and Phosphoria mining facilities. Although Royster had a phosphate chemical plant in central Florida it had no mining facilities and thus it historically bought its phosphate rock requirements from IMC and other local producers. Acquisition of Royster's 1,927 acres of high grade phosphate reserves [2] was important to IMC's ongoing mining operations [3] and in 1967, IMC first began negotiating for the Royster reserves. In May and June of that year, IMC ran extensive tests and analyses of the property, and at the time believed there were approximately 19,017,823 pounds of recoverable product. [4] The parties considered several different ways to structure the transaction, but were unable to reach agreement. After a flurry of activity in late 1967 and early 1968, negotiations broke off until early 1971. At that time the parties again discussed various proposals, one of which included a sale to a third party who would then lease the *530 mineral rights to IMC, or to IMC and Royster as joint venturers. [5] The main disagreement was over a satisfactory price for the reserves. [6]
One important factor in the negotiations was petitioner's relationship with its principal lender, *531 the Prudential Insurance Company. IMC was highly dependent upon Prudential because its poor financial condition [7] made raising money in the public markets difficult, if not impossible. IMC borrowed $100 million from Prudential pursuant to a note agreement entered into in December 1967. [8] Two provisions of that agreement were pertinent to the negotiations with Royster. First, IMC was not to incur "funded debt" exceeding $25 million in aggregate principal amount; [9] funded debt was defined as any liability with a term of greater than one year. Petitioner could not buy the Royster reserves, valued at approximately $30 million, without violating this covenant. The agreement also limited aggregate rental obligations of IMC to a total of $4,500,000 per annum, but "rentals of, and royalties on, mineral properties" were excluded from this total. Thus, as IMC construed the agreement, a lease of the reserves would be acceptable to Prudential, whereas an out-right purchase would not be permissible. *532 Other factors were also important. IMC was in a period of recovery after several very bad years when the bottom fell out of the phosphate market. The company was overburdened with debt and had a poor financial rating. While the Royster transaction was important, IMC's management also believed it critical that they avoid incurring any new balance sheet debt.[10] Moreover, Royster was insisting on a sale that would generate capital gains rather than ordinary income. This made a lease directly from Royster to IMC impossible. IMC's outside counsel prepared some memoranda on the tax consequences of various structures in 1967, but not too much attention was placed on IMC's taxes in 1972. At that time the company had unused loss carry-forwards of approximately $42 million. *533 After protracted negotiations, Royster and IMC reached a tentative agreement in February 1973. IMC was to purchase the Royster phosphate reserves via a sale to an acceptable bank selected by IMC. Royster would be paid over a 10-year period, and IMC would work out its payment schedule with the bank that actually purchased the reserves. IMC would supply Royster's phosphate rock requirements via a separate agreement. Early in 1973, either James Gibson or Edward Saunders, [11] both alumni of the University of Chicago, mentioned the possibility of investment in the Royster deal to the University of Chicago. The University has owned interests in a number of oil and gas properties over the years. Those properties which would generate unrelated business taxable income if owned directly by the University were held by a wholly owned for-profit subsidiary, Relay Corporation. Other interests were held directly by the University. The University also holds some silver mining claims, and has mineral interests in a tract of land in Oregon. *534 On May 2, 1973, Richard Burridge, Treasurer of the University of Chicago, made a formal proposal to the University's Investment Committee. His letter requested authority to create a new, wholly-owned subsidiary of the University Interstate Corporation, [12] Wayland Corporation, for the sole purpose of purchasing a 2,000 acre parcel in Florida, i.e., the Royster property. Mr. Burridge evaluated the University's role in the following manner: [A] lease will be entered into between Wayland, as lessor, and IMC, as lessee, for a 10-year term * * * which lease will provide for fixed minimum royalty payments to Wayland which will be sufficient to service the mortgage debt, cover all corporate expenses, including income taxes, and provide a net annual profit after taxes of a minimum of $20,000 to Wayland * * *. * * * While the details of the transaction are quite intricate, the only investment of University Interstate Corporation will be the initial paid-in capital of $1,000. It is understood by all parties that the holders of the mortgage will look only to the property, Wayland Corporation, and the lease to IMC, for payment of the purchase price, and the mortgage expressly states *535 that no liability shall be created or enforced against any stockholder, officer or director of Wayland. In view of the small amount of risk and the potential profit of at least $300,000 over a 10-year period, it is recommended that the Treasurer be authorized to incorporate Wayland Corporation for the purposes hereinabove set out * * *. [13]
Accordingly, Wayland was incorporated on May 2, 1973; the proposal was noted as being approved on May 3, 1973. After receiving the approval of their respective Boards, the parties consummated the transactions on May 16, 1973. Wayland Corporation executed a promissory note in which it agreed to pay Royster a total of $30,724,800 [14] in biannual installments beginning July 1, 1973, and ending July 1, 1983. This *536 note constituted payment for the property in Polk County, which Royster granted to Wayland by warranty deed. Royster and Wayland also executed a mortgage deed (also referred to as a purchase money mortgage) in which Wayland deeded the property back to Royster; upon full satisfaction of the promissory note, the deed would become null and void and Wayland would be vested with full title to the property again. On the same date, Wayland Corporation leased the Royster property to petitioner for an initial term of 10 years. The lessee was granted full right to mine the property and to take all steps necessary in the mining operation. IMC had sole discretion in the method of its operations and in its use of the land, but was required to "mine in such a manner that the maximum number of tons of economically recoverable phosphate can be removed from the entire lands." IMC was to pay a minimum royalty in monthly installments of $252,300 in may and June 1973; thereafter it would pay in quarterly installments of $756,900. IMC was also required to pay tonnage royalties at the rate of $1.48 per ton *537 of 2,000 pounds, dry basis, of phosphate rock mined and recovered. Until tonnage royalties exceeded minimum royalties, tonnage royalties payable were credited against minimum royalties already paid. At that point the lessee could credit the excess against minimum royalties due in the future. IMC was also responsible for all taxes, special assessments or other charges levied against the lands. The lease required IMC to keep the lessor indemnified against all liability or loss of every kind, and to maintain insurance at its own cost and expense. IMC had the right to expand the original term of the lease for up to 5 years if it decided to discontinue mining operations during the initial term. IMC could also extend the lease for 10 years following expiration of the original term. The lease provided a different royalty schedule for the extended term. The minimum royalty was $1,000 per year. Tonnage royalties, at $1.48 per dry ton, were again creditable against minimum royalties already paid during the extension period. Excess tonnage royalties could be credited against minimum royalties due in the future. Upon expiration of the lease term, the lessee was to surrender the *538 lands to the lessor. The state of Florida requires a party who severs minerals from the land to file a mining and reclamation plan, and to carry it out. Fla. Stat. sec. 211.32(3)(a), (1972). Thus, under the terms of the lease IMC was responsible for restoring the land prior to returning it to Wayland. The reclamation process consists of filling and leveling pit areas, re-sloping and mulching earthen dams around settling areas and the planting of grass and trees on the property. The land can be used for any purpose after reclamation that it was used for prior to mining, with certain exceptions not relevant here. IMC had no interest in the actual lands; the only significance of the land itself was the cost of reclamation. On its Federal income tax returns Wayland reported the salvage value of the land as $90,954, or 1,819.08 acres at $50 per acre. Wayland Corporation subsequently assigned its right, title, and interest in the lease, including the right to receive royalties, to Royster Company "as security for the payment of the Promissory Note of even date herewith." Finally, Royster, Wayland, and the First National Bank of Chicago (hereinafter FNBC) entered into an escrow agreement *539 whereby Royster assigned its rights to receive payments to FNBC as escrow agent. Funds delivered to FNBC were to be placed in an escrow account and invested at Wayland's direction. The escrow agent was to make payments to Royster in accordance with the promissory note and mortgage. Interest earned on the account was payable to Wayland. Prior to execution of the various agreements, both Royster Company and IMC performed extensive tests on the property in order to accurately value the reserves. The land was typically divided into parcels of 40 acres ("Forties") for exploratory testing. In the 1971 exploratory testing, two test holes were drilled on each forty; the current practice is to take four samples per forty. Drill crews take a sample of the core which is analyzed by geologists at a metallurgical laboratory. [15] The cores are then divided into the different strata found by the geologists. These "splits" are processed in a miniature phosphate processing plant. The results are magnified to give an estimate of the total recovery from that area. Several other factors are also analyzed and all the objective data is fed into a computer which is programmed to determine how *540 much it will cost to mine the hole. If the cost is above a predetermined limit, the hole is deemed "unmineable." This cut-off point fluctuates according to the company's cost of mining and producing the phosphate and the market price, among other things. Total mineable acres and amounts of recoverable phosphate are calculated from these results. Actual recovery costs could, and indeed did, vary from the amount estimated in the prospecting samples. First, when a hole was classified "unmineable" the "tons of recoverable product" figure for that hole was set at zero. When only two test holes were drilled on a 40-acre parcel, half the area could be deemed unmineable when in fact there may have been a significant amount of phosphate in the matrix. [16] Also, if the area around the "unmineable" hole was "mineable," it was more economical to mine straight through. Sometimes, therefore, there was recovery from a hole initially deemed *541 "unmineable." Second, if technology had improved between the time of sampling and the time of actual mining, the company could employ techniques which would not have been economically feasible under the earlier conditions. Third, the market price for phosphate would affect actual recovery. If the price were higher, IMC would spend more per ton, knowing that the extra cost would be recovered. Conversely, if the market was down, rock that was more expensive to mine might be left in the earth. [17]
*542 The actual physical location of a particular tract also affected recovery. One the Royster property, for example, there was a lake on about one-half of Forty 16. Because Royster only owned part of that area, under state law the wetlands belonged to the state. IMC subsequently purchased the adjoining property, and thus became free to mine in and around the marshy area. Similarly, if adjacent property is not owned by the mining company, some phosphate is lost around the edges of the tracts. On its corporate Federal income tax returns for the taxable years ended June 30, 1974, petitioner claimed a deduction of $3,458,852 for royalties paid in connection with its lease of the Royster property from Wayland. In the notice of deficiency dated July 28, 1980, respondent disallowed the claimed royalty deduction on the basis that such payments were part of the purchase price of minerals in place and not payments made pursuant to a lease. [18]
OPINION The sole issue presented for our resolution is whether a transaction structured as *543 a sale of certain mineral property by Royster Company to Wayland Corporation and a contemporaneous lease of that property to petitioner was in substance a sale of the property directly to petitioner. In essence, we are asked to determine whether the transactions at issue should be given effect as the parties intended them or whether they should be recast in another form with attendant tax consequences more favorable to the fisc. It has long been the established and undisputed rule that the economic substance of a transaction, not its form, is controlling for Federal tax purposes. Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Gregory v. Helvering,293 U.S. 465 (1935); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). We are primarily concerned with realities of economics and business rather than with labels and documents. Helvering v. Lazarus & Co.,308 U.S. 252, 255 (1939). We recognize, however, the equally well-established principle that a transaction must be given effect in accordance with *544 what actually occurred and not in accord with what might have happened. Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 148-149 (1974). In addition, we realize that tax planning is an economic reality in the business world and that the effect of tax laws on transactions is routinely considered along with other economic factors. Commissioner v. Brown,380 U.S. 563, 579-580 (1965) (Harlan, J., concurring). Thus, as this Court has recently stated, "[t]axpayers are generally free to structure their business transactions as they please, though motivated by tax avoidance, provided a non-tax or business purpose is also present." Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983). Although such legal maxims are easily quoted, their sometimes conflicting application to a given situation requires and analysis of the facts. We begin therefore with a summary of the relevant facts. Petitioner International Minerals and Chemical Corporation mines and processes large quantities of phosphate rock in central *545 Florida. In 1967, IMC began negotiating for the largest remaining block of phosphate reserves in central Florida. These reserves were owned by Royster Company, a small chemical producer that processed phosphate rock but did not do its own mining. The parties were unable to reach an agreement at that time. In 1972, discussions once again began in earnest. Several requirements of each party made agreement difficult, but the details were finally worked out in May 1973. The transaction as finally structured involved several interlocking steps. First, Royster sold the property to Wayland Corporation, a subsidiary of the University of Chicago created for purposes of this transaction. Wayland executed a promissory note for the purchase price ($30,724,800, including 4 percent interest), and a mortgage deed as security. Wayland then leased the property to IMC for an initial term of 10 years. The minimum royalties payable to Wayland slightly exceeded the payments due on the Royster note. IMC was required to pay tonnage royalties to Wayland, with provision for credit against minimum royalties, and vice versa, so that IMC's liability was for the larger of the minimum or tonnage royalty *546 due at any given time. They were also required to pay all taxes and assessments on the land, to keep the property insured, and to indemnify Wayland for any losses. Wayland assigned its interest in the lease to Royster as further security for the note. Finally, the parties executed an escrow agreement whereby all payments made to Wayland were placed in an escrow account at the First National Bank of Chicago (FNBC). As escrow agent FNBC was to invest the funds at Wayland's direction and to make the required note payments to Royster. IMC made its first royalty payments in fiscal 1973, and began mining operations in fiscal 1974. Because of its election under section 1.612-3, Income Tax Regs., no royalty deductions were claimed until fiscal 1974. [19]
*547 Respondent disallowed petitioner's 1974 royalty deduction, determining that IMC had in substance purchased the Royster property and therefore was only entitled to deductions for depletion and interest. Respondent argues that Wayland was a straw man created solely to further IMC's tax avoidance purposes. In contrast, petitioner contends that the sale and lease agreement is a genuine multi-party transaction, that Wayland possesses real rights and interests that cannot be imputed to either Royster or IMC, and that the structure of the transaction was dictated by business needs rather than by tax-avoidance motives. As will be discussed, we agree with petitioner. Petitioner argues that the case of Frank Lyon Co. v. United States,435 U.S. 561 (1978), is controlling here. The Supreme Court in Frank Lyon found a genuine multi-party transaction having economic substance on the following facts: The seller-lessee in that case, Worthen Bank, was prohibited by State and Federal banking regulations from financing the construction of a new bank building through conventional methods. The bank, therefore, entered into a sale leaseback arrangement whereby it leased the *548 underlying land to an independent third party, Frank Lyon Co., (Lyon). [20]Worthen also sold the building to Lyon in stages during construction and then leased it back. Lyon, the buyer-lessor, purchased the building for $7,640,000, putting $500,00 down and financing the remaining sum from a third-party lender. The loan was secured by a 25-year mortgage, an assignment of the ground and building lease, the buyer's promise to assume personal responsibility for the repayment of the loan, plus a commitment that the lease would extend through the entire term of the mortgage at a rental at least equal to the monthly mortgage payments. During the primary term of the lease, Worthen Bank retained options to repurchase the building at the end of the 11th, 15th, 20th and 25th years for amounts equal to the outstanding mortgage plus the initial $500,000 down payment plus 6 percent compound interest. Alternatively, Worthen, the seller-lessee, could exercise its option to renew the lease for eight additional 5-year terms after the expiration of the 25-year primary lease. *549 Prescribed rental agreements during the first 25 years were exactly equal to Lyon's mortgage payments but were reduced for each elected renewal. [21] In addition, the building lease was a "net lease" whereby the bank remained obligated to maintain and insure the building, and to pay all taxes and utility charges. In the notice of deficiency, the Commissioner disallowed Lyon's claimed depreciation, interest and other related deductions on the basis that Lyon was not the owner of the building for tax purposes and that the transaction was merely a two-party financing scheme designed to provide economic benefits to Worthen Bank and a guaranteed return to Lyon. [22]
In an unpublished opinion the District Court held in the taxpayer's favor finding that the legal intent of the parties had been to create *550 a bona fide sale-leaseback in accordance with the documents evidencing the transactions and rejected the argument that Worthen was acquiring an equity interest in the building through its rental payments. The United States Court of Appeals for the Eighth Circuit reversed, holding that Lyon was not the true owner of the building and, therefore, was not entitled to the disputed deductions. Upon grant of certiorari, the Supreme Court reversed the judgment of the Court of Appeals, finding that the form of transaction reflected its substance. The Court held that: [W]here * * * there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbused with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. * * * [435 U.S. at 583-584]. Thus, in order to decide whether the principles enunciated by the Court in Frank Lyon require the *551 same result here as was reached in that case, we must analyze the instant facts in view of the following: (1) whether there was a genuine multi-party transaction; (2) whether the transaction has economic substance; (3) whether the structure was compelled or encouraged by economic or business realities; and (4) whether the transaction is imbued with tax-independent considerations and not based solely on tax avoidance features. See Hilton v. Commissioner,74 T.C. 305, 347 (1980), affd. 671 F.2d 316 (9th Cir. 1982). We note first that the facts before us here present a transaction structured as a sale and lease and not the classic sale-leaseback situation present in Frank Lyon. Rather, the original owner of the property in question here, Royster, completely and incontrovertibly divested itself of ownership through the structuring of this transaction. In addition, and again unlike Frank Lyon, it is the lessee and not the lessor who is the petitioner herein. However, respondent argues herein as he did in Frank Lyon that the purported lessee is in fact the purchaser-owner of the property. Thus, we must decide whether petitioner IMC leased *552 the Royster property from Wayland as the form of the transaction suggests or whether it purchased the property from Royster.Respondent contends that the instant case is distinguishable from Frank Lyon on its facts. While we agree that the facts are not identical we believe that essentially the same issue is presented and that most of any factual differences strengthen rather than weaken petitioner's case. Cf. Estate of Gilman v. Commissioner,65 T.C. 296, 306 (1975), affd. per curiam 547 F.2d 32 (2d Cir. 1976). We must first consider whether the sale and subsequent lease of the Royster property was a genuine multi-party transaction having economic substance. Respondent argues that in substance petitioner was the purchaser of the property from Royster and that the existence of Wayland should be disregarded. [23] While respondent colorfully refers to Wayland as a "straw man," a "mere shell," a "dummy titleholder," a "nominee of pure gossamer," and even the fanciful "corporate version of a penurious skid row derelict," we do not believe that the existence of the purported purchaser-lessor can be so cavalierly disregarded. *553 Although it is true that Wayland as a corporate entity was created solely for the purpose of participating in this transaction and was minimally capitalized, it must also be considered that it was created as a subsidiary of University Interstate Corporation, wholly owned by the University of Chicago, and not by the other parties to the transaction. It was immaterial to Royster and IMC whether the University itself, one of its existing corporations, or a newly created subsidiary purchased the reserves from Royster. The University had occasion to own interests in minerals and oil and gas properties prior to the Royster transaction and it generally created subsidiaries to hold such interests for purposes of limiting its potential liability and insulating itself from the receipt of unrelated business income. [24]
It is the general rule of law that the corporate form cannot be disregarded *554 unless we perceive it to be "a sham or unreal." Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943). However, whether the purpose of the creation of an entity [B]e to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [319 U.S. at 438-439. (Fn. refs. omitted).] Under this rule Wayland itself certainly cannot be deemed a sham. It holds title to property, is obligated to make payments on a note, is entitled to receive minimum and tonnage royalty payments from its lessee, is entitled to interest earned on the escrow account at FNBC and will own the Royster property outright at the termination of the lease. These rights and obligations are clearly substantial ones. [25] Furthermore, these rights and obligations cannot be imputed to either Royster or IMC as the record contains no evidence of agency or common control. *555 While the record does show that the investment was first mentioned to the University by either the treasurer of or counsel to IMC (both of whom happened to be alumni), such connection clearly does not suffice to compromise the independence of Wayland. We note that in Frank Lyon the Court found that Lyon was an independent party even though its majority shareholder, Mr. Frank Lyon, was on Worthen Bank's board of directors. The Court remarked that the transaction "was not a familial one arranged by Worthen * * *. Had Lyon not appeared, another interested investor would have been selected. The ultimate solution would have been essentially the same." [Frank Lyon Co. v. United States,435 U.S. at 575-576.] Business realities are such that new corporations frequently are formed solely to enter into a particular transaction and often are thinly capitalized with the only funds available being those earned by the assets. A corporation's existence cannot be disregarded on this basis. The Supreme Court dealt with a similar argument in Commissioner v. Brown,380 U.S. 563, 575 (1965): *556 To require a sale for tax purposes to be to a financially responsible buyer who undertakes to pay the purchase price from sources other than the earnings of the assets sold or to make a substantial down payment seems to us at odds with commercial practice and common understanding of what constitutes a sale. * * * The transaction as structured by the parties differs in certain essential ways from a sale directly from Royster to IMC. First, IMC had an open-ended liability to pay royalties on all extracted phosphate rock within the lease term; the "best efforts" clause in the lease ensured that IMC would continue to mine the reserves even after the minimum royalties were completely paid. In an outright sale, all profits after payment of the mortgage note would belong to IMC. Second, royalties were paid quarterly while note payments were due semi-annually. Thus, interest earned during the 3-month gap belonged to Wayland rather than to IMC as in a direct sale. Finally, residual rights to the land belonged to Wayland whereas if IMC were the true purchaser it would own the land at the end of the lease. These differences imbue the transaction with economic substance apart from its beneficial *557 tax consequences to petitioners; that is, Wayland had a "realistic hope of profit." [26]Dunlap v. Commissioner,74 T.C. 1377, (1980), revd. and remanded on another issue 670 F.2d 785 (8th Circ. 1982); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 209-210 (1983). Frank Lyon also requires that the structure of the transaction be compelled or encouraged by economic or business realities and imbued with tax-independent considerations. Petitioner also passes this test. The acquisition of Royster's phosphate reserves was important to IMC's ongoing mining operations. The parties carried on negotiations for several years but were unable to reach agreement for several reasons. Royster *558 insisted on a sale that would generate capital gains rather than ordinary income. However, IMC was unable to purchase the reserves directly because it was overburdened with debt and had a poor financial rating. Moreover, an agreement with its principal lender prohibited IMC from incurring the amount of long-term debt necessary to purchase the reserves. Given these business constraints, it was reasonable for IMC to attempt to structure the transaction without jeopardizing its relationship with its lender or abandoning its plan to acquire the reserves. As in Frank Lyon where the "usual simple two-party arrangement was legally unavailable to Worthen," [435 U.S. at 575] a direct sale or lease from Royster was not available to petitioner IMC because of the conflicting business requirements of those parties. The transaction as ultimately structured accommodated the business needs of both IMC and Royster. Because Royster was unwilling to lease the reserves to IMC and IMC was unable to buy the reserves, a third party, Wayland, performed the necessary intermediary function. While it is true that Royster and IMC looked for an entity to perform the buyer-lessor function *559 here, such function is nonetheless a legitimate one. Thus, we find on these facts that the transaction as structured was motivated by the business needs of petitioner and Royster and not merely for tax avoidance purposes. [27] Whatever vitality Respondent's argument had prior to Frank Lyon, that case dealt the coup de grace to his position. In conclusion, we find after a review of the facts that a genuine multi-party transaction having economic substance existed among Royster, Wayland, and IMC, and that the transaction as structured was dictated by business needs and not merely by tax *560 avoidance motives. Therefore, we hold that the form of the transaction reflects its substance. Decision will be entered under Rule 155.
Footnotes
1. For example, in 1969, petitioner acquired reserves near its Noralyn plant by swapping properties it owned near a Mobil plant for properties Mobil owned near the Noralyn plant. IMC also purchased Mobil's Clear Springs mining facility at that time.↩
2. "High grade" refers to the percentage of phosphate in the phosphate rock that has been separated from the sand and clay in which it is formed. The purity is measured in a "BPL", (bone phosphate of lime) formula. High grade reserves generally contained rock of 75 BPL or higher. ↩
3. IMC had several long-term commitments to supply high-grade phosphate rock. Without the Royster reserves they anticipated problems in meeting those commitments.↩
4. Ryster's analysis estimated that there was 21.8 million tons of recoverable product on the property. ↩
5. The parties considered various ways to accomplish their respective ends. The essential notion was to let Royster provide the reserves and have IMC supply the mining and selling manpower and knowhow. ↩
6. Royster and IMC wanted to find a formula whereby the risks of fluctuation in the market price of phosphate rock would be shared. They had difficulty agreeing on an appropriate formula.↩
7. IMC suffered record losses in 1969, and was still recovering in the early 1970's. The market price of phosphate dropped from 25 to 40 percent in the mid to late 1960's. IMC, being highly dependent upon the sale of phosphate for its revenues, was devastated by this price drop. ↩
8. This figure was raised to $140 million in 1973. The funds from Prudential were primarily used to reduce short term debt, which was generally more expensive. None of the Prudential funds was available to use in purchasing the Royster reserves. ↩
9. The limit in the 1967 agreement was $10 million. It was increased to $25 million by an amendment in June 1970.↩
10. "Balance sheet" debt differs from "off-balance-sheet" debt insofar as the former must be shown in the body of a balance sheet or financial statement, while the latter may be shown in the footnotes under generally accepted accounting principles. Petitioner assumed that a lease obligation would be treated as off-balance-sheet debt. IMC would not have entered the Royster deal if it had resulted in new balance sheet debt of $30 million. Richard A. Lenon, chairman and chief executive officer of IMC, noted in a memorandum dated December 7, 1972, that "If you aren't careful, we are going to get a $30 million debt on our books."↩
11. James Gibson was a treasurer, and later vice-president and treasurer of IMC; Edward Saunders was a partner at Sidley & Austin, IMC's counsel.↩
12. The University Interstate Corporation is a wholly-owned subsidiary of the University of Chicago. ↩
13. Mr. Burridge's memorandum also noted that Royster and IMC predicted that the property could be mined out in 8 years. Tonnage royalties were due shortly after the phosphate rock was recovered. Wayland thus had the potential to earn significant interest on amounts paid in long before note payments were due to Royster.↩
14. This represented principal of $25,798,975, with interest at 4 percent per annum.↩
15. Core samples provide a variety of data including depth of overburden, thickness of matrix (ore-bearing strata), and all relevant chemical characteristics including the BPL value and the concentrations of each of the various undesirable elements.↩
16. Mr. Shelton L. Cawley, a production services superintendent for IMC gave an example of this. On Section 11, Forty number 18, the 1971 survey reported 34.62 total acres of which one-half or 17.31 acres were deemed unmineable. When the Forty was resurveyed in 1981 and 14 additional holes were drilled, out of 38.47 total acres 35.97 were deemed mineable and only 2.5 acres were considered unmineable. The 1971 survey estimated 12,089 tons of recoverable product per mineable acre for a total of 209,261 tons (12,089 X 17.31), whereas the 1981 survey estimated 15,166 tons of recoverable product per mineable acre for a total of approximately 545,500 tons (15,166 X 35.97). ↩
17. The basic sequential steps in phosphate mining are as follows: 1. removal of the overburden with large draglines to expose the ore-bearing Bone Valley strata; 2. excavation of the ore strata by dragline and reduction to slurry consistency by hydraulic means in depressions called slurry pits; 3. pumping of the resulting slurry from the slurry pits to a beneficiation plant via pipe line; 4. removal of the clay refraction of slurry feed by means of a washing and screening process; 5. size separation of pebble phosphate out of the remainder by a screening process; 6. separation of the fine phosphate particles (i.e. nonpebble) from similar sized sand particles by means of a flotation process employing various reagents and mechanical apparatus known as flotation cells.↩
18. However, respondent did allow additional deductions for depletion and interest consistent with his view of the substance of the transaction.↩
19. Sec. 611 provides a deduction for depletion to owners of interests in "mines, oil and gas wells, other natural deposits, and timber." Sec. 612 states that the basis for depletion is the adjusted basis for gain of sec. 1011. Sec. 1.612-3, Income Tax Regs. sets out the rules for treatment of advanced royalties. The rule in effect during the years at issue provided that: SEC. 1.612-3. DEPLETION; TREATMENT OF BONUS AND ADVANCED ROYALTY. * * * (b) Advanced royalties. * * * (3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows: (i) As deductions from gross income for the year the advanced royalties are paid or accrued, or (ii) As deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, is sold. * * * Every taxpayer must make an election as to be treatment of all such advanced royalties in his return for the first taxable year in which such amounts are paid or accrued. A taxpayer will be considered to have made an election in accordance with the manner in which such items are treated in the return. * * * An election made under this section is binding for the taxable year for which made and for all subsequent years, and the taxpayer must treat all advanced royalties paid or accrued in all subsequent years in the same manner. * * *↩
20. Frank Lyon was Lyon's majority shareholder and board chairman and also served on Worthen Bank's board of directors.↩
21. The total rent over the 25-year primary term of the lease was $14,989,767.24 which amount equaled the principal and interest payments necessary to amortize the $7,140,000 mortgage loan.↩
22. Respondent's analysis of the transaction was that Lyon loaned Worthen $500,000 and acted as a conduit for the transmission of principal and interest from Worthen to the mortgage lender.↩
23. There is no question but the IMC and Royster are viable business entities.↩
24. We note that in Frank Lyon Co. v. United States,435 U.S. 561, 581↩ (1978), the Court remarked upon "Lyon's departure from its principal corporate activity into this unusual venture."
25. The University's investment committee estimated an annual after-tax return to Wayland of $20,000 and saw a potential to earn at least $300,000 over the 10-year term of the lease. In addition, the mined-out property was estimated to be worth at least $90,000.↩
26. As the Court stated in Frank Lyon,"so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes. What those attributes are in any particular case will necessarily depend upon its facts. * * *" [435 U.S. at 584↩.]
27. Surely the fact that IMC calculated the different tax impacts of owning and leasing the reserves does not require a finding that the transaction was entered into solely for tax avoidance purposes. As we have recently stated: Parties have the right to choose particular structures for their transactions and where those transactions serve purposes other than tax avoidance, courts are loathe to disturb them. * * * [Laughinghouse v. Commissioner,80 T.C. 425, 436↩ (1983)]