ESTATE OF ERIC STROBER, DECEASED, SUE STROBER, EXECUTRIX, AND SUE STROBER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Strober v. Commissioner
Docket No. 28130-89
United States Tax Court
T.C. Memo 1992-350; 1992 Tax Ct. Memo LEXIS 375; 63 T.C.M. (CCH) 3158; June 22, 1992, Filed *375 Decision will be entered under Rule 155. David W. Bernstein, for petitioners. Theodore R. Leighton and Laurie B. Kazenoff, for respondent. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in, additions to, and increased interest on the underpayment of petitioners' Federal income taxes: Additions to Tax
Increased Interest
Year
Deficiency
Sec. 6649
Sec. 6661
Sec. 6621(c)
1983
$ 239,916
$ 71,975
$ 59,979
[1]
1984
264,324
79,297
66,081
[1]
The issues for decision are: (1) Whether decedent's purported sale and leaseback of computer equipment should be respected for Federal income tax purposes; (2) whether decedent acquired sufficient benefits and burdens of ownership to be treated as the owner of the computer equipment for income tax purposes; (3) whether decedent was at risk under section 465 with respect to indebtedness; (4) whether petitioners are entitled to claim deductions for depreciation, interest expense, and management and brokerage fees; (5) whether petitioners are liable under section 6659 for an underpayment *376 of taxes attributable to a valuation overstatement or, in the alternative, whether petitioners are liable under section 6661(a) for a substantial understatement of income taxes; and (6) whether the sale and leaseback transaction was tax motivated within the meaning of section 6621(c). All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulated facts and attached exhibits. Petitioner Sue Strober, who also is the executrix for petitioner, the Estate of Eric Strober (decedent), resided in Old Westbury, New York, when she filed her petition. Decedent was a resident of Old Westbury, New York, when he died on January 26, 1988. During 1983 and 1984, decedent was the president and chief executive officer of five corporations that were engaged in the wholesale distribution of building materials. On December 30, 1983, Computer Leasing, Inc. (CLI), purchased various pieces of computer equipment from International Business Machines Corp. (IBM), some of which it leased to Allstate Insurance Co. (Allstate). CLI obtained a nonrecourse loan from Metropolitan *377 Savings Bank, FSB (Metropolitan), to finance this purchase and provided Metropolitan with a security interest in the property. Allstate paid its monthly rental payments due CLI directly to Metropolitan to discharge CLI's obligation on its nonrecourse loan to Metropolitan. The equipment that CLI leased to Allstate is described below: Quantity
Manufacturer
Machine Type
Model
Description
130
IBM
5210
E2
Printer
173
IBM
8775
1
Display Terminal
On September 16, 1983, Randolph Computer Leasing Corp. (Randolph) purchased various pieces of computer equipment from IBM, some of which it leased to Electronic Data Systems Leasing Corp. (EDS). Randolph received a nonrecourse loan from Pittsburgh National Bank (Pittsburgh) to finance this acquisition and provided Pittsburgh with a security interest in the property. EDS paid its monthly rental payments due Randolph directly to Pittsburgh in reduction of Randolph's obligation on its nonrecourse loan to the bank. The equipment that Randolph leased to EDS is described below: Quantity
Manufacturer
Machine Type
Model
Description
2
IBM
3380
AA4
Direct Access
Storage
6
IBM
3380
B04
Direct Access
Storage
1
IBM
3880
003
Storage Control *378 On December 30, 1983, Randolph purchased various pieces of computer equipment from CLI. This equipment included the equipment that CLI was leasing to Allstate. The purchase agreement provided that Randolph pay $ 604,603 in cash and execute a nonrecourse note payable to CLI in the amount of $ 4,511,124. Pursuant to an agreement dated December 31, 1983, Randolph leased the computer equipment back to CLI. CLI had the right to set off against rental amounts payable by CLI to Randolph any unpaid amounts due CLI from Randolph pursuant to the sale of the computer equipment. Also on December 30, 1983, Randolph sold various pieces of computer equipment, including the equipment leased by Allstate, to UCC Leasing Ltd. (UCC Leasing). The purchase agreement provided that UCC Leasing pay $ 718,613 in cash and assume $ 4,155,849 of the $ 4,511,124 nonrecourse note payable by Randolph to CLI. UCC Leasing and two other related corporations, UCC Equipment Ltd. (UCC Equipment) and UCC Management Ltd. (UCC Management), were all incorporated in the fall of 1983 and each had the same sole officer and director. On December 30, 1983, UCC Leasing sold this computer equipment to Westwind Leasing Corp. *379 (Westwind). Westwind paid UCC Leasing two checks, one in the amount of $ 194,500 and the other in the amount of $ 267,000. Westwind also executed a "Mortgage Note - Security Agreement" in favor of UCC Leasing for $ 2,405,000. Under the terms of this note, Westwind was to pay UCC Leasing $ 267,000 upon execution of the note for partial interest due and 93 consecutive monthly payments of $ 42,514.64 each, commencing March 1, 1984. Westwind is wholly owned by Alan Asher and his wife, Mimi Asher. In 1983, Westwind's only employees were Alan and Mimi Asher. Westwind was formed in the early eighties to serve as the middle company in equipment leasing transactions. Westwind would purchase various equipment from UCC Leasing and simultaneously sell this equipment to investors. It earned a profit on the difference between its purchase price and the selling price. In December 1983, Steven Schwartz (Schwartz) approached decedent's attorney, David Bernstein (Bernstein), about investing in a computer equipment leasing program sponsored by Ulysses Capital Co. (Ulysses). Ulysses was a limited partnership formed in 1982 "to develop and administer tax-advantaged programs for individuals and *380 corporations." Ulysses was the 100-percent shareholder of UCC Equipment and UCC Leasing during the taxable years 1983 and 1984. Schwartz provided Bernstein with a private placement memorandum or prospectus entitled "ULYSSES LEASING PROGRAM 1983, Leveraged Sale-Leaseback of Computer Peripheral Equipment". Ulysses was offering "to highly sophisticated investors the opportunity to purchase peripheral computer equipment subject to a mortgage note and existing initial user leases and to lease such equipment as lessor." In the section of the prospectus entitled "CONFLICTS OF INTEREST", was the representation, "Determining the purchase price for the Equipment, including the terms of the Mortgage Note, constitutes dealings among parties who have had prior business dealings and, accordingly, the terms of the Purchaser's acquisition of the Equipment should not necessarily be viewed as an 'arm's-length' transaction." Included with the prospectus were financial projections prepared by UCC Management. "The projections are based on certain assumptions of fact and interpretations are intended to maximize the amount of tax loss reportable by the Purchasers in the early years of the Acquisition." *381 The projections provided: "As of November 8, 1983 neither the identification nor the purchase of peripheral computer equipment, which is the basis of these projections, has taken place." The projections assumed that an investor would purchase computer equipment subject to initial user leases for $ 650,000, and lease this equipment to UCC Leasing for a term of 96 months commencing on or about December 1, 1983. UCC Leasing would pay the investor a rental fee of $ 9,125 per month from December 1, 1983, to November 30, 1987; $ 5,203 from December 1, 1987, to December 31, 1987; and $ 10,629 per month from January 1, 1988, to November 30, 1991. For purposes of the projections, it was assumed that the initial user leases would be for a period of 48 months. It was assumed that the equipment would be re-leased to a user immediately after the expiration of the initial user leases, and that an investor would receive an additional $ 3,815 per month from this supplemental lease. Further, the projections assumed that the equipment would have a residual value of $ 73,125 at the conclusion of the lease to UCC Leasing. Included as a part of the financial projections was a projection of revenue *382 and expenses, exclusive of supplemental rental income and gain on the sale of the equipment. An investor that purchased $ 650,000 of equipment and leased the equipment to UCC Leasing could expect to incur cumulative taxable losses of $ 562,100 for the years 1983 through and including 1987, and cumulative taxable income of $ 374,698 for the years 1988 through and including November 1991, the date on which the investor's lease agreement with UCC Leasing would terminate. Also included was a chart that illustrated projected cash flow, exclusive of supplemental rental income and gain on the sale of the equipment. According to this projection, an investor would not receive net annual cash flow until the year 1991. In 1991 the net annual cash flow projected was $ 8. After discussing the computer equipment leasing program with Bernstein and after reviewing the prospectus, decedent decided to invest in the program. On December 22, 1983, decedent purchased computer equipment from Westwind for $ 2,600,000. This amount represents an amount four times greater than that anticipated in the financial projections of the properties. Decedent never attempted to see or examine the computer equipment *383 that he purchased. The purchase amount was payable as follows: $ 195,000 by check payable to Westwind and $ 2,405,000 by execution and delivery of a "Mortgage Note - Security Agreement" in favor of Westwind. Under the terms of this note, decedent paid Westwind $ 267,000 upon execution of the note for partial interest due, and was to make 93 consecutive monthly payments of $ 42,514.64 each, commencing March 1, 1984. Petitioners never made, nor were they ever requested to make, any out-of-pocket cash payments to Westwind on decedent's mortgage note. The computer equipment purchased by decedent from Westwind is listed below: Quantity
Manufacturer
Machine Type
Model
Description
130
IBM
5210
E2
Printer
173
IBM
8775
1
Display Terminal
2
IBM
3380
AA4
Direct Access
Storage
6
IBM
3380
B04
Direct Access
Storage
1
IBM
3880
003
Storage Control
The equipment that decedent purchased from Westwind was the same equipment that Westwind had purchased from UCC Leasing. Westwind used the $ 195,000 payment that it received from decedent to pay its $ 194,500 obligation to UCC Leasing for its purchase of the equipment. Decedent subsequently leased this computer *384 equipment back to UCC Leasing. The lease agreement between decedent and UCC Leasing provided that UCC Leasing would pay decedent $ 36,503.60 per month for 47 months; $ 20,813.04 for the month of December 1987; and $ 42,514.88 per month for 47 months. Decedent also would receive 75 percent of all rental proceeds paid by any sublessees after the termination of the initial user lease and the right to the equipment's net residual value at the end of the lease with UCC Leasing. At or near the time of his investment in the leasing program, decedent executed a management agreement with UCC Management, in which he paid a $ 120,000 management fee. Decedent also executed an equipment broker agreement with UCC Equipment, in which he paid an $ 18,000 equipment broker fee. Decedent's total out-of-pocket cash investment in the leasing program was $ 600,000. Decedent also executed a remarketing agreement with UCC Leasing, in which UCC Leasing would be the exclusive agent to market decedent's computer equipment at the end of the initial user lease for 10 percent of the proceeds received from any sale or re-lease of the equipment. The management agreement that decedent entered into with UCC *385 Management provided that UCC Management would "within a reasonable time after the execution of this Agreement * * * obtain an appraisal of the Equipment, in form and substance satisfactory to the Purchaser in the Purchaser's good faith judgment". Ulysses obtained an appraisal of the computer equipment from John R. Wilkins (Wilkins), president of Communigraphics, Inc. The appraisal failed to discuss the IBM Model 5210 printer or the IBM Model 8775 display terminal, which equipment comprised 303 of the 312 pieces of computer equipment purchased by decedent. The appraisal stated: (1) The fair market value of the equipment was $ 2,597,729; (2) the equipment would have an estimated fair market value of at least 41 percent in November 1988 and at least 20 percent in December 1991; and (3) each item of equipment would have an estimated remaining useful life of at least 2 years at the end of December 1991. The appraisal contained no explanation of the manner in which Wilkins reached his conclusions, other than the statement: "My opinion as to the current fair market value of the Equipment is based on my familiarity with the types of equipment involved and my knowledge of current market *386 conditions. In determining the estimated useful life and the estimated residual value of the Equipment, I have utilized the benefits of the foregoing experience." On their jointly filed Federal income tax returns for the taxable years 1983 and 1984, decedent and petitioner Sue Strober claimed Schedule C losses as follows: Income
1983
1984
Rental Income
0   $ 438,008
Expenses
Depreciation
$ 390,000
572,000
Interest Expense
28,060
373,392
Other Expenses--"Fees"
61,772
21,264
Total Expenses
$ 479,832
$ 966,656
Losses (Income less expenses)
$ 479,832
$ 528,648
In her notice of deficiency, respondent disallowed these losses and determined additions to taxes and increased interest as previously set forth. OPINION The issues for decision are: (1) Whether decedent's purported sale and leaseback of computer equipment should be respected for Federal income tax purposes; (2) whether decedent acquired sufficient benefits and burdens of ownership to be treated as the owner of the computer equipment for income tax purposes; (3) whether decedent was at risk under section 465 with respect to indebtedness; (4) whether petitioners are entitled to claim deductions *387 for depreciation, interest expense, and management and brokerage fees; (5) whether petitioners are liable under section 6659 for an underpayment of taxes attributable to a valuation overstatement or, in the alternative, whether petitioners are liable under section 6661(a) for a substantial understatement of income taxes; and (6) whether the sale and leaseback transaction was tax motivated within the meaning of section 6621(c). Taxpayers are generally free to structure their business transactions as they please, though motivated by tax-reduction considerations. Gregory v. Helvering, 293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. on this issue 81 T.C. 184, 196 (1983). A transaction will not be disregarded for Federal income tax purposes simply because it is motivated by considerations of reducing tax. Frank Lyon Co. v. United States, 435 U.S. 561, 581 (1978). However, it is well established that a transaction entered into solely for the purpose of tax reduction, and which is without economic, commercial, or legal purpose other than the expected tax benefits, *388 is an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States, supra; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1243 (1981). A sale-leaseback transaction is a sham and will be ignored for Federal tax purposes if it is determined "that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." Rice's Toyota World, Inc. v. Commissioner, supra at 91. We will separately consider whether petitioners have shown either that decedent's sale and leaseback transaction of computer equipment was motivated by a business purpose other than tax savings or that the transaction had economic substance. Our inquiry of business purpose and economic substance is inherently factual. See Larsen v. Commissioner, 89 T.C. 1229, 1252 (1987), affd. in part and revd. in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). 1. Business Purpose
The business purpose *389 inquiry concerns decedent's motives in entering the transaction. Rice's Toyota World, Inc. v. Commissioner, supra at 92. Based on the record in this case, we conclude that decedent's sole motivation for investing in the computer equipment leasing program sponsored by Ulysses was to achieve the tax deductions that the sale leaseback transaction provided in the early years of the lease. Decedent's representative, Bernstein, testified at trial that it was only after he and decedent carefully reviewed the prospectus that he advised decedent to invest in the Ulysses leasing program. He explained to decedent that profit from this investment would arise from the residual value of the equipment at the end of the lease with UCC Leasing and any second rental income from UCC Leasing's re-leasing the equipment after the expiration of the initial user leases. However, the information in the prospectus as to residual value or supplemental rental income could not have reasonably supported such a conclusion. Contained in the prospectus was a summary of projection assumptions which stated that the equipment which was the basis of these projections had not yet been identified *390 or purchased. We believe that any representations made by the promoters as to residual value of and rental income to be derived from computer equipment that had not yet been identified or purchased were speculative, unrealistic, and completely unfounded. If decedent had a business purpose other than obtaining tax benefits, he could not have reasonably committed himself to the transaction based upon unsupported representations. As illustrated by the projected statement of revenue and expenses and projected statement of cash flow included with the financial projections, the only potential for profit from this investment was from supplemental rental income from re-leasing the equipment at the end of the initial user lease and from gain on the sale of the equipment at the end of the lease with UCC Leasing. The projections stated: "supplemental rentals will commence immediately upon the expiration of the initial end user leases and will provide $ 3,815 per month to the individual investor. Further, this projection assumes that the equipment will have a residual value of $ 73,125 at the conclusion of the lease to UCC." These projections were based on an initial user lease of 48 months, *391 a subsequent re-lease of 48 months, and a favorable market for used IBM equipment at the end of the 96-month lease with UCC Leasing. Yet the promoters were hopeful, at best, that these ends could be met. A disclaimer in the financial projections stated: "There can be no assurance that a lessee can be secured when the initial end user leases expire nor can there be any assurance that the equipment will have a residual value." Bernstein testified that he did review the initial user leases of the equipment that decedent purchased, and that 303 of the 312 pieces of equipment had an initial lease with Allstate for 36 months, and 9 pieces had an initial lease with EDS for 60 months. However, he never spoke with the end users of the equipment to verify its existence, its value, and its useful life before advising decedent to invest. He also did not renegotiate or adjust the purchase price from Westwind or the terms of the lease agreement with UCC Leasing to reflect the differences between these lease periods and the initial net lease period contemplated in the financial projections. Nor did he investigate the rental market for previously leased IBM computer equipment to determine if *392 there was any basis for concluding that UCC Leasing would be successful in leasing the equipment immediately after the initial leases expired. Decedent had no grounds on which reasonably to believe that any rental income would be produced during the period after the initial user leases expired and before the expiration of the lease with UCC Leasing. Also, because he failed to confirm whether there was any market demand for the equipment, he had no basis to believe that the equipment could be sold after the lease period with UCC Leasing. If decedent had a business purpose, he would not have relied exclusively upon the promoter's unsupported estimates of residual value and supplemental rental income. Bernstein testified at trial that he and decedent relied upon the appraisal prepared by Wilkins in deciding to invest in the leasing program. However, the management agreement that decedent entered into with UCC Management, dated December 22, 1983, states that "within a reasonable time after the execution of this Agreement", UCC Management would obtain an appraisal of the equipment. The appraisal is dated simply December 1983, and this date is found at the bottom of page 5 of the *393 report. It is unclear to us whether decedent or Bernstein reviewed the appraisal before or after investing in the leasing program. In any event, we attach very little significance to the appraisal. As we previously have noted in another case involving an appraisal prepared by Wilkins, it is "nothing more than a listing of unsupported conclusions as to the Equipment's value" and is "not a document worthy of reliance." Mele v. Commissioner, T.C. Memo. 1988-409. Wilkins fails to discuss in his appraisal 303 of the 312 pieces of equipment purchased by decedent; he fails to attach a fair market or residual value to each specific model of equipment; he fails to discuss his methodology for arriving at his value; and he fails to discuss the marketplace for rentals of the specific models of equipment purchased by decedent. Based on Wilkins' appraisal, decedent had no basis to reasonably believe that the residual value of the equipment or potential supplemental rental income would make the transaction profitable. Most important to us, however, is the fact that Wilkins was hired by Ulysses, the promoter of the leasing program. If decedent had a business purpose, he *394 would not have relied exclusively upon Wilkins' appraisal but instead would have independently investigated the equipment's fair market value and its expected residual value before investing in the leasing program. Finally, none of the documentation that Bernstein and decedent reviewed states anywhere that an investor in the leasing program would profit from this investment or the amount of profit that an investor could expect. We think that such a statement, supported by financial and marketplace analyses, would be a starting place for any investor with an actual business purpose other than tax benefits. 2. Economic Substance
As we stated in Gilman v. Commissioner, T.C. Memo. 1989-684, affd. 933 F.2d 143 (2d Cir. 1991): "Petitioner's transaction 'has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits'." (Citation omitted.) We analyze the transaction as a prudent investor would have. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affd. on this issue 81 T.C. 184, 209 (1983). *395 We place some weight upon the taxpayer's subjective statement as to his nontax motive, but far greater emphasis upon objective facts demonstrating a realistic potential for profit. Cherin v. Commissioner, 89 T.C. 986, 992 (1987). The leasing transaction entered into by decedent would be profitable only if the residual value of the equipment, at the end of the initial user leases with Allstate or EDS or at the end of the lease with UCC Leasing, was sufficient to allow him to recover an amount in excess of his investment. The only information relied upon by decedent and provided by petitioners at trial to establish residual value was the appraisal prepared by Wilkins. However, as we stated earlier, Wilkins' appraisal is simply a listing of unsupported conclusions as to value that cannot be relied upon for an accurate determination of the equipment's residual value. Decedent's decision to invest in the equipment without further investigating the equipment's residual value and the potential for re-leasing the equipment at the expiration of the initial user leases, despite a showing that without such supplemental income there was no possibility of making a profit, *396 leads us to conclude that profit could not have been decedent's motive for investing in the equipment. The only competent evidence of residual value in the record is the report of respondent's expert, S. Paul Blumenthal (Blumenthal), an employee of American Technology Appraisal Service (ATAS). Blumenthal is senior vice president of ATAS and has appeared before this Court as an expert witness on numerous occasions. Blumenthal determined the fair market value of the equipment purchased by decedent by using the comparable sales method of valuation. The fair market value contemplates a representative transaction between an informed seller, being under no compulsion to sell, and an informed buyer, being under no compulsion to buy. The comparable sales method involves monitoring transactions on the used technology market and using actual sales of identical equipment whenever possible. Blumenthal gathered information about the values of specific models of used IBM equipment as of December 1983. He consulted the October 1983 issue of Computer Price Guide; he consulted the October 1983 issue of Readers Report, a publication published by Computer Merchants which explained the various *397 markets for IBM equipment; and he consulted a February 1982 study that his firm had conducted on the values of various IBM equipment. After making adjustments for the differences in the dates, Blumenthal arrived at a fair market value of $ 2,147,577 for the equipment purchased by decedent in December 1983. This amount is $ 452,423 less than the purchase price that decedent paid Westwind. Next, Blumenthal determined the residual value of decedent's equipment at the end of the initial leases with Allstate and EDS and at the end of the lease with UCC Leasing. Blumenthal determined the introduction date of decedent's computer equipment into the marketplace and researched the computer industry in general, and IBM in particular, and took into consideration technological developments and innovations. If new technological advances were developing rapidly, this could cause a severe decline in the value of decedent's equipment. With regard to the Allstate equipment, Blumenthal determined the future residual values of the IBM Model 5210-E2 printers and the IBM Model 8775-1 display terminals as of January 1987, the date when the initial lease with Allstate expired. The 5210 used technology *398 that dated from 1977, and by 1983, the date of decedent's purchase, it was 6 years old. Blumenthal reviewed a residual value forecast of comparable printers prepared by his firm in January 1981. The forecast stated that the 5210 would have a residual value of 19 percent of its list price in 1987 and 4 percent in 1989, and would become economically obsolete thereafter. Blumenthal also reviewed a December 1981 study prepared by his firm on residual values of equipment technologically similar to the 8775. The 8775 was introduced into the marketplace in 1978. He concluded that the 8775 would have a residual value of 15 percent of its list price in 1987 and 5 percent in 1988, and would become economically obsolete thereafter. Blumenthal concluded that in December 1983, the total residual value of the Allstate equipment as of the termination of the initial lease in January 1987 was $ 330,601. The residual value of the Allstate equipment as of the end of 1991, the date of the termination of decedent's lease with UCC Leasing, was zero. With regard to the EDS equipment, Blumenthal determined the residual values of the IBM Models 3380-AA4 and 3380-B4 direct access storage devices and *399 the IBM Model 3880 storage control units as of December 1988, the date when the initial lease with EDS expired. Blumenthal used a forecast published in Computer Economics Report entitled "1984-1990 PROJECTED RESIDUAL VALUES OF IBM DISK DRIVES AS % OF LIST PRICE". This forecast was available in 1983. The Models 3380 were introduced in the marketplace in 1981, had a residual value of 24 percent of their list price as of December 1988, and were expected to decline to minimal value by the end of the eighties. The Model 3880 had a residual value of 11 percent of list price as of December 1988 and was expected to decline to minimal value by the end of the eighties. Blumenthal concluded that in December 1983, the total residual value of the EDS equipment, as of the termination of the initial lease in December 1988, was $ 157,818. The residual value of the EDS equipment as of the end of 1991, the date of the termination of decedent's lease with UCC Leasing, was zero. Accordingly, if decedent could not have re-leased the equipment at the end of the initial leases with Allstate and EDS but was required instead to sell the equipment, he would have recovered only $ 488,419. This amount *400 is $ 111,581 less than decedent's $ 600,000 cash investment in the leasing program. Blumenthal prepared a re-lease revenue stream analysis to determine the amount of rental revenue the computer equipment could reasonably be expected to earn if it was re-leased after the initial leases with Allstate and EDS. If the equipment's predicted residual value is not sufficient at the end of the initial lease period to allow taxpayers to recoup their cash investment, the likelihood of receiving re-lease proceeds must be examined to determine whether the transaction was imbued with economic substance. Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990). The analysis by Blumenthal incorporated such factors as the prime rate of interest at the time of the transaction, cost of lease service, depreciation and tax rates, and information contained in the transaction documentation, such as the provision contained in decedent's lease with UCC Leasing that permitted decedent to receive 75 percent of the lease proceeds. Blumenthal concluded that if all of the equipment decedent purchased could be re-leased immediately at the termination *401 of the initial leases with Allstate and EDS, the amounts of rental revenue the equipment could reasonably be expected to earn were $ 276,363 and $ 131,926, respectively. This total of $ 408,289 is $ 191,711 less than decedent's $ 600,000 cash investment in the leasing program. We were impressed with Blumenthal's expert report and his testimony. His report was thorough and complete, the supporting materials that he used were well documented, and his discussion of the computer market during the relevant time period and the advent of new technology was helpful. We find his appraisal to be an accurate determination of the equipment's residual value and an accurate indication of the rental revenues that the equipment could have produced. We conclude that in December 1983 a prudent investor, relying upon independently obtained appraisals and research, would not have concluded that decedent's transaction offered a reasonable opportunity for economic gain exclusive of tax benefits. As we said in Gilman v. Commissioner, T.C. Memo. 1989-684, affd. 933 F.2d 143 (2d Cir. 1991): Putting aside the business purpose and economic substance requirements and *402 just focusing on the nature of the transaction, we believe it is clear that this transaction served no useful economic purpose. The original transaction between * * * [CLI and Allstate and Randolph and EDS] was a completed transaction which served the economic and business purposes of all of the parties. Nothing more was needed. * * * [The subsequent purchases by Randolph, UCC Leasing, and Westwind and the subsequent sale to decedent had no effect upon the original transactions between CLI and Allstate and Randolph and EDS.] In fact, there is no evidence that the end users even knew of the paper shuffling done by * * * [CLI, Randolph, UCC Leasing, Westwind and decedent.] In essence * * * [decedent] claims to have purchased a Christmas tree, but actually only purchased the right to hang some ornaments on a tree that was already in place and serving its full useful and economic purpose, and to take possession of the tree after the Christmas holidays. Accordingly, the transaction had no economic substance. Since decedent also lacked a business purpose, the transaction will not be respected for Federal tax purposes. Further, petitioners are not entitled to deductions for management *403 and brokerage fees and depreciation. See Forseth v. Commissioner, 85 T.C. 127 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. sub nom. Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affd. sub nom. Enrici v. Commissioner, 813 F.2d 293 (9th Cir. 1987), affd. without published opinion sub nom. Wooldridge v. Commissioner, 800 F.2d 266 (11th Cir. 1986); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981). However, because the "Mortgage Note - Security Agreement" between decedent and Westwind represented a valid obligation, petitioners may deduct the interest paid on it. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 95-96 (4th Cir. 1985), revg. on this issue 81 T.C. 184 (1983). As this Court stated: "Even if the notes themselves do not give rise to tax deductions because they were payments for anticipated tax benefits, the interest actually paid on those notes is deductible under section 163." Rose v. Commissioner, 88 T.C. 386, 423 (1987), affd. 868 F.2d 851 (6th Cir. 1989). *404 Due to our disposition of the economic substance and business purpose issues, we need not consider respondent's arguments regarding section 465 and whether decedent acquired sufficient benefits and burdens of ownership to be considered the owner of the computer equipment for tax purposes. The only remaining issues for our consideration are whether petitioners' underpayment of taxes is attributable to a valuation overstatement within the meaning of section 6659(c), or in the alternative, whether petitioners are liable under section 6661 for a substantial understatement of income taxes, and whether the transaction was tax motivated within the meaning of section 6621(c). There is a valuation overstatement for purposes of section 6659 if the adjusted basis of the equipment claimed by a taxpayer on a return was 150 percent or more of the correct adjusted basis. Sec. 6659(c). When a transaction lacks economic substance, section 6659 will apply because the correct basis is zero and any basis claimed in excess of that is a valuation overstatement. Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991), affg. T.C. Memo. 1989-684. Accordingly, petitioners' *405 underpayment of taxes is attributable to a valuation overstatement. Since there is a valuation overstatement under section 6659(c), the transaction was tax motivated within the meaning of section 6621(c)(3)(A)(i). Decision will be entered under Rule 155. Footnotes
1. 120 percent of the adjusted rate of interest under section 6601.↩